John F. MAHER, et al.,
Plaintiffs-Appellees,

v.

ZAPATA CORPORATION, et al.,
Defendants-Appellees,

v.

William MALDONADO,
Objector-Appellant.

No. 81–2261.

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1983.

See also, D.C., 490 F.Supp. 348.

Bruce E. Gerstein, New York City, for objector-appellant.

Jess Homer Hall, Jr., Houston, Tex., for Maher, et al.

John L. McConn, Jr., Richard A. Sheehy, Houston, Tex., Thomas F. Curnin, Thomas J. Kavaler, New York City, for Zapata.

Robert A. Hall, Houston, Tex., for First City Nat. Bk. of Houston.

John Held, Michael Paul Graham, Houston, Tex., for Gueymard, Israel, Lassiter, Mackin, Shiels & Wall.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal by William Maldonado, a Zapata Corporation stockholder, from a judgment approving settlement of a shareholders' derivative action brought by other shareholders on behalf of Zapata Corporation against several of its past and present officers and directors based upon their alleged violations of the federal securities laws and state corporate law.

The principal questions are whether the district court abused its discretion in approving the settlement where the preclusive effect of the settlement agreement and the judgment rendered thereon could possibly bar the further prosecution of certain claims pending in related derivative actions brought by Maldonado; and whether the notice of the settlement agreement sent to Zapata shareholders was defective because it did not expressly state that the proposed settlement agreement and judgment might preclude the continuation of the claims being asserted in the two related derivative actions. We hold that, in the context of this case, the notice was adequate and sufficiently informed the shareholders of the possible preclusive effects of the proposed settlement, and that the district court's approval of the settlement, with regard to its fairness, was not an abuse of discretion, notwithstanding the possible preclusion. We accordingly affirm.

I.

FACTS

A. INTRODUCTION.

A somewhat detailed recitation of the complex facts of this case is necessary for an understanding of it and our rulings herein. Our recitation has been made more difficult because three derivative actions, which arise, at least in part, out of a common factual situation, have been proceeding

at the same time in three different courts, and various rulings, described below, made by the three courts have affected the progress of each action.[1]

B. ZAPATA.

Appellee Zapata Corporation ("Zapata" or the "Corporation") was organized in 1954. Although Zapata is incorporated under the laws of Delaware, it is licensed to do business in Texas and has its home office in Houston, Texas. Until 1966, Zapata was engaged primarily in providing drilling services to offshore oil and gas operators. In the late 1960's, however, under the influence of William H. Flynn ("Flynn"), who became a director in 1966 and chief executive officer in 1969, Zapata began to expand and diversify its interests. By September 1978, Zapata had over 100 direct and indirect subsidiaries, the great majority of which were wholly owned by Zapata, over 7,000 employees, 520 million dollars in annual gross revenues, and approximately one billion dollars in assets. As of September 1980, there were about 10,000 Zapata shareholders owning a total of approximately 10,600,000 outstanding shares of Zapata common stock, which was (and is) traded on the New York Stock Exchange and registered under section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l (the "Exchange Act").

C. THE STOCK OPTION PLAN.

On June 13, 1970, Zapata's board of directors established a "nonqualified" stock option plan for senior officers of Zapata and its subsidiaries. The plan provided only for options that were not qualified under the Internal Revenue Code, with the result that when employees exercised their options they would incur taxable income in the amount by which the then fair market val-

---

**1.** Our factual statement of the case is drawn, of course, from the voluminous record, and from the various written opinions rendered in connection with the other pending actions. *See Maldonado v. Flynn,* 413 A.2d 1251 (Del.Ch. 1980); *Maldonado v. Flynn,* 417 A.2d 378 (Del. Ch.1980); *Zapata Corp. v. Maldonado,* 430

A.2d 779 (Del.Supr.1981); *Maldonado v. Flynn,* 448 F.Supp. 1032 (S.D.N.Y.1978); *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979); *Maldonado v. Flynn,* 477 F.Supp. 1007 (S.D.N.Y.1979); *Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y. 1980); *Maldonado v. Flynn,* 671 F.2d 729 (2d Cir.1982).

ue of the stock so purchased exceeded the option price, and Zapata would be entitled to an income tax deduction in the same amount. On July 14, 1970, the Stock Option Committee of the board of directors[2] granted options to key officers and employees of Zapata in accordance with the plan.[3] The price per share to exercise the options was $12.15, payable in cash. The $12.15 per share option price, which exceeded the market value of the Zapata stock at the time the options were granted, was to remain in effect throughout the existence of options. The options became exercisable in five equal cumulative installments, the dates of the next to last and last of which were, respectively, July 13, 1973 and July 14, 1974, after which latter date all were exercisable.[4] However, no options could be exercised more than ten years after the date on which they were granted. The plan was adopted subject to subsequent approval by Zapata shareholders, which occurred on January 11, 1971. Under the terms of the plan, the directors retained the right to make any amendments they chose to it without shareholder approval, except for amendments which either increased the total number of shares subject to option, changed the class of employees eligible to participate, or increased the duration of the option period beyond ten years. There has been *no attack* in these proceedings regarding the terms and provisions of the stock option plan, or the mechanics of its approval by the directors and shareholders. Nor has there been any attack on the grant of options under the plan to Flynn and the other senior officers (*see* note 3, *supra*).

In late June 1974, Flynn, who was at that time chairman of the board, chief executive officer, and president of Zapata, consulted with representatives of Lehman Brothers, Zapata's investment bankers, about the possibility of Zapata making a cash tender offer for shares of its own common stock. Based on these consultations, which lasted from about June 28 to July 1, 1974, Flynn decided that Zapata would proceed with a tender offer in the open market for its own common stock at a price of $25 to $30 per share. On the morning of July 2, 1974, at the request of Zapata's management, trading in Zapata stock on the New York Stock Exchange was suspended, pending the future announcement of the tender offer. When trading was suspended, Zapata stock was selling for approximately $18.50 per share.

Four of Zapata's eight directors, who were senior officers, held options under the stock option plan.[5] By July 1, 1974, these officer-directors were aware of the possibility of a tender offer at a price of between $25 and $30 per share, and each had discussed it informally with Flynn. They realized that if they were to exercise their

---

**2.** The Committee consisted of three directors, none of whom were, or had been within the year preceding their appointments to the Committee, eligible to receive options under the plan.

**3.** Among the recipients of these options were the following officers:

| | |
|---|---|
| William H. Flynn | 65,000 shares |
| J. B. Harrison | 29,000 shares |
| Michael R. Naess | 21,000 shares |
| Eugene F. Shiels | 21,000 shares |
| Robert B. Wall | 14,500 shares |
| Ronald C. Lassiter | 14,500 shares |

Wall and Lassiter were granted options to purchase an additional 2,000 and 4,000 shares, respectively, at $12.15 per share on October 1, 1973.

**4.** The record indicates that before July 1974, several of the officers had not yet exercised stock options that had previously matured.

**5.** In July 1974, Zapata's board of directors consisted of the following persons: William H. Flynn, Sam Israel, Jr., A.G. Gueymard, J.B. Harrison, B.J. Mackin, Michael R. Naess, Eugene F. Shiels, and Rene R. Woolcott. The four officer-directors were Flynn, Harrison, Shiels, and Naess. Harrison and Naess were not made defendants in this action (the Texas action), but were defendants in *both the New York and Delaware actions* (described in part I.D. of this opinion). Woolcott was made a defendant only in the Delaware action. On August 13, 1975, the SEC filed a complaint against Woolcott in the southern district of New York in connection with his July 2, 1974 purchase of Zapata common stock on behalf of a company controlled by his mother, allegedly acting on inside information. As a result of this complaint, to which Woolcott consented to judgment, he resigned from the Zapata board of directors.

options after the announcement of the tender offer, they would likely incur a substantial increase in federal income tax liability, but that this additional tax liability could be avoided if the options were exercised before the announcement of the tender offer.[6]

After trading was suspended on the New York Stock Exchange, a quorum of Zapata's nonoptionee directors[7] held a special meeting at 3:00 p.m. on July 2, 1974, where they adopted resolutions authorizing essentially interest-free loans to six senior Zapata officers (Flynn, Harrison, Shiels, Naess, Lassiter, and Wall) to cover the amount they had or would expend in exercising their stock options and the amount of federal income tax liability they would incur on account of such exercise. These resolutions also modified the stock option plan so that the final twenty percent of the shares covered by each of the options granted in 1970 became exercisable on July 2, 1974, instead of not being exercisable until July 14, 1974.[8] The modifications to the plan did not affect the price paid for the stock, which remained at $12.15 per share. The optionees exercised their options later that day.[9]

**6.** As the Second Circuit explained:

"Under applicable federal tax laws an employee who exercises stock options such as those received by the six senior officers realizes ordinary income in the amount of the difference between the fair market price of the stock at the time the option is exercised and the option price paid for the stock (the 'bargain spread'). I.R.C. § 83(a), Treas.Reg. § 1.421–6(d); see *Commissioner of Internal Revenue v. LoBue,* 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956). The corporation, on the other hand, is entitled to deduct the bargain spread as a business expense, it being considered a form of compensation to its employees. I.R.C. § 83(h), Treas.Reg. § 1.421–6(f); see *Divine v. Commissioner of Internal Revenue,* 500 F.2d 1041, 1050–57 (2d Cir.1974). By accelerating the exercise date of the last installment of the options and thus allowing the six officers to exercise their options prior to the foreseen imminent rise in the market price of Zapata stock, the Board permitted the six officers to save themselves a considerable amount of tax liability, and prevented the Corporation from enjoying a correspondingly higher tax deduction, assuming the six officers would have exercised their options on or after the originally scheduled date, July 14, 1974." *Maldonado v. Flynn,* 597 F.2d at 792.

**7.** The nonoptionee directors present at this meeting were Gueymard, Mackin, Israel, and Woolcott. Flynn was present, but abstained from voting.

**8.** The loans were interest free, except that if the borrower voluntarily terminated employment with Zapata within five years an amount of interest equal to ten percent of the original principal became due. A small portion of the principal was due by July 1977, but the vast majority was due by July 1989, or on termination of employment (for any reason) with Zapata, whichever was first. None of the stock purchased could be disposed of except for cash, and any such cash proceeds were to be applied to reduction of the loans. The loans were unsecured. The loan amounts were to cover not only the purchase price on options thereafter exercised, but also that for options previously exercised (a provision which was apparently applicable only as to two of the officers, Naess and Lassiter). The resolutions also amended the plan to allow the options to be exercised by notes, rather than in cash, in apparent recognition of the fact that the transactions contemplated by the loans, whatever their form, amounted in substance to the use of optionee notes to Zapata to exercise the options.

**9.** The options were exercised as follows:

| Name | Options Exercised | Aggregate Purchase Price | Aggregate Market Value on Date of Purchase |
|---|---|---|---|
| William H. Flynn | 65,000 | $ 789,750 | $1,222,813 |
| Michael R. Naess | 11,000 | 133,650 | 206,938 |
| Eugene F. Shiels | 21,000 | 255,150 | 395,063 |
| J. B. Harrison | 29,000 | 352,350 | 545,563 |
| Ronald C. Lassiter | 10,300 | 125,145 | 193,769 |
| Robert B. Wall | 14,900 | 181,035 | 280,306 |
| Total | 151,200 | $1,837,080 | $2,844,452 |

In accordance with the above-referenced resolutions, on or about July 2, 1974, Zapata lent the six officers the following amounts in return for a note on terms as above-described (*see* note 8, *supra*) from each officer for the amount of the loan:

| | |
|---|---|
| Flynn | $ 789,750 |
| Naess | 252,720 |
| Shiels | 255,150 |
| Harrison | 352,350 |
| Lassiter | 185,895 |
| Wall | 181,035 |
| TOTAL | $2,016,900 |

The loan proceeds were, in substance, used to purchase the stock on the exercise of the options (except that Naess and Lassiter also

On July 3, 1974, the board met and formally authorized the tender offer. On July 8, 1974, after obtaining commitments for the necessary financing, Zapata publicly announced its intention to make a tender offer for 2,300,000 shares of its own common stock at $25 per share. Trading on the New York Stock Exchange resumed, and the closing price for Zapata stock on July 8, 1974, was $24.50 per share. By accelerating the exercise date of the options, Zapata was deprived of a potential increased federal tax deduction, which corresponded with the tax savings of the optionees, in an amount equal to the difference in price per share between July 2 and July 14, 1974, multiplied by the number of shares comprising the final twenty percent installment of option shares which would not have been exercisable until July 14 but for the acceleration of the exercise date (this, of course, assumes the optionees would have exercised their final twenty percent installment on or after July 14 had there been no acceleration). Employing an assumed fifty percent tax bracket for both Zapata and the optionees, this would have amounted to an increase in Zapata's tax liability, and a decrease in that of the optionees collectively, of approximately $115,000.[10]

On March 14, 1975, because of problems with the Federal Reserve Board, each of the notes the six officers had given to Zapata in return for the loans made to them to fund the exercise of their options were entirely repaid using sums borrowed by the officers from the First City National Bank of Houston, Texas. Three days later, on March 17, 1975, Zapata's Compensation Committee passed resolutions authorizing new loans to the six officers to fund their tax liability produced by the exercise of their options in July 1974.[11]

apparently received some loan proceeds to cover their previous exercise of options under the plan).

10. As reflected in note 3, *supra,* the officers in question were granted options for a total of 165,000 shares in July 1970, and for another 6,000 shares in October 1973. By a time well prior to July 1, 1974, these options were fully exercisable as to all but some 38,000 shares (as 80 percent of the 165,000 shares, and 20 percent of the 6,000 shares, had fully "matured" by then under the original option terms). In the Delaware action, Maldonado

"... claimed that the acceleration of the exercise date of the options deprived Zapata of a federal tax deduction in an amount equal to that saved by the optionees because the options were exercised on July 2, 1974, when the price of Zapata stock was $18.8125 rather than on July 14, 1974, when the price of Zapata stock was at or near $24.50." *Maldonado v. Flynn, supra,* 413 A.2d at 1255. Applying the difference between the July 2 and July 14 prices—approximately $6 per share—to the approximately 38,000 shares produces a total of $228,000 in foregone Zapata deductions and optionee income, worth, at an assumed fifty percent tax rate, about $114,000.

The Zapata Independent Investigation Committee (*see* text at part I.G., *infra*) concluded that the foregone potential tax deduction was not material "since the Company had a tax loss carry forward and investment tax credits which made additional deductions relatively valueless." In support of this contention, the Committee filed in the New York action and subsequently, during February 1980, in the Texas action, the December 1979 affidavit of its vice president and treasurer explaining in detail that because Zapata's 1973 (year ending September 30, 1973) income tax was calculated under the "alternative" method of section 1201(a) of the Internal Revenue Code and Zapata incurred large tax operating and capital losses in 1974 (and certain earlier years), additional ordinary deductions in 1974 would not have reduced Zapata's taxes, due to the mechanical nature of the interaction between section 172, dealing with loss carry-backs and carry-overs, and section 1201(a) (*see United States v. Foster Lumber Co.,* 429 U.S. 32, 97 S.Ct. 204, 50 L.Ed.2d 199 (1976)), and that for this reason, combined with subsequent years' tax losses and investment tax credits, if the additional potential deductions asserted by Maldonado had been available to Zapata the net effect to it would only have been to accelerate by one year a $30,000 tax refund it became entitled to in October 1976. This affidavit is supported by sworn copies of the referenced portions of Zapata's tax returns for the years in question. The record contains no meaningful rebuttal to or denial of this affidavit, its calculations or conclusions.

The Committee also determined that even if the entire claimed foregone deduction could have been utilized by Zapata, nevertheless the "loss" of such a deduction was an appropriate cost of executive compensation.

11. In February 1975, the Federal Reserve Board advised Zapata that it could not, under the Reserve Board's interpretation of the applicable

These 1975 loans were unsecured and interest free, except that if the borrower voluntarily terminated employment with Zapata within five years, an amount equal to ten percent of the original principal would be due as interest; principal was payable by March 1990 or on termination of employment (for any reason), whichever was sooner. They were designed to achieve as many of the objectives of the prior loan arrangements as possible, that is, to provide funds for the payment of the officers' taxes resulting from their exercise of the stock options; to provide an incentive to the officers to remain with Zapata beyond the maturity of their stock options; and to partially compensate the officers for the loss of the benefit of the prior loan arrangements.

In a proxy statement issued March 26, 1975, by Zapata's management, Zapata disclosed the number and value of the options exercised in July 1974. The proxy statement described the terms and amounts of both sets of loans, including their interest-free nature, and their purpose to aid the optionees in exercising the options and paying the resulting taxes. It also referred to the fact that the loans aided the officers in exercising their options when "the differential between the market value of the Common Stock and the exercise price of their options, and therefore the Federal income tax liability resulting from exercise, would be minimized." The proxy statement did not, however, report the acceleration of the exercise date from July 14 to July 2, 1974, and its relationship to the tender offer, nor did it disclose that an amendment to the option plan was required to accelerate the exercise date or permit the exercise on credit. Shareholder approval of the modifications to the stock option plan or of the loans made in connection therewith was neither sought nor obtained.[12]

## D. MALDONADO'S DELAWARE AND NEW YORK ACTIONS.

On June 3, 1975, appellant-objector William Maldonado ("Maldonado") filed a shareholders' derivative action on behalf of Zapata against Flynn, Sam Israel, Jr., A.G. Gueymard, J.B. Harrison, Ronald C. Lassiter, B.J. Mackin, Michael R. Naess, Eugene F. Shiels, Rene R. Woolcott, and Robert B. Wall, in the Chancery Court of Delaware. This suit, which is referred to herein as the Delaware action, was based on the defendants' alleged breaches of fiduciary duties under the common law, particularly in regard to the modifications to the stock option plan in July 1974, the referenced asserted adverse tax consequences to Zapata of the acceleration of the option exercise date, and, possibly, the interest-free loans made in connection therewith.[13] Maldonado's counsel asserted below that discovery in this action, including the depositions of four of the defendant directors, was completed prior to June 1977.

margin regulations, make the loans to fund the officer-directors' federal income tax liabilities created by the exercise of their options on July 2, 1974, so long as the July 1974 loans (made to fund the purchase price of those options) were outstanding. The loans authorized at this March 1975 meeting (and made that day or a few days later) were as follows: Flynn, $575,000; Harrison, $210,000; Lassiter, $140,000; Naess, $140,000; Shiels, $140,000; and Wall, $120,000.

12. The record indicates that Zapata's management felt that since the July 1974 "purchase loans" had been repaid, shareholder approval of the July 1974 amendments was not required, and this position is supported by provisions of the stock option plan. *See Maldonado v. Flynn,* 597 F.2d at 793 ("stockholder approval of the modification of Zapata's stock option plan was not required under its charter or by-

laws and was not mandated by Delaware law").

13. *See Maldonado v. Flynn,* 413 A.2d at 1255 ("Maldonado brought this stockholder's derivative suit ... alleging that the actions of the directors of Zapata in accelerating the time for the exercise of their stock options constituted a breach of the fiduciary duty owed to Zapata .... He claimed that the acceleration of the exercise date of the options deprived Zapata of a federal tax deduction in an amount equal to that saved by the optionees") and at 1259 ("Maldonado is attacking the 1974 decision of the directors to accelerate the option dates"). *See also Maldonado v. Flynn,* 417 A.2d at 382 (Maldonado's suit asserts "but one claim arising from but one transaction," namely, the July 1974 stock option plan amendment accelerating the exercise date for the final twenty percent of the options).

On June 29, 1977, Maldonado filed another shareholders' derivative action, this one in the federal district court for the southern district of New York against the same individuals that were defendants in the Delaware action, except for Rene R. Woolcott. This action, which is referred to herein as the New York action, asserted claims under the Exchange Act based on alleged violations of section 10(b), 15 U.S.C. § 78j(b); Rule 10–b5, 17 C.F.R. § 240.10b–5; section 14(a), 15 U.S.C. § 78n(a); Rule 14a–9, 17 C.F.R. § 240.14a–9; and section 7, 15 U.S.C. § 78g. Maldonado also asserted, under the court's pendent jurisdiction, the same common law breaches of fiduciary duties alleged in his Delaware action. In March 1978, the district court, Judge Weinfeld, dismissed Maldonado's federal securities law claims under Fed.R.Civ.P. 12(b)(6), and, as there were no federal claims to which the common law claims could be pendent, also dismissed the common law claims. *Maldonado v. Flynn,* 448 F.Supp. 1032 (S.D.N.Y. 1978).

On appeal, the Second Circuit, in an opinion issued in April 1979, reversed Judge Weinfeld's dismissal of a portion of the section 14(a) claim, but affirmed his dismissal of the section 10(b) claim. *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979). The Second Circuit held there was no deception and hence no violation of section 10(b) in Zapata's sale of the stock to its officers pursuant to their July 2, 1974 exercise of the options, because the board of directors had the authority to amend the stock option plan as it did without shareholder approval (*see* note 12, *supra*), and it acted through fully informed, disinterested directors not shown to have been dominated or controlled in their decision by any of the optionees, *id.* at 795 col. 1, and accordingly:

> "Since the *amendments were thus validly enacted by* a vote of *disinterested board members* who had been *fully informed* of all material facts, their knowledge was attributable to the corporation and no 'deception' occurred ...." *Id.* at 795 (emphasis added).[14]

However, the Second Circuit also held that Judge Weinfeld erred by dismissing on motion so much of Maldonado's section 14(a) action as was based on the claim that the 1975, 1976, and 1977 elections for Zapata directors were invalid since the proxy statements failed to disclose the directors' July 1974 amendments to the stock option plan, which was a matter "that a reasonable shareholder ... could have considered ... important, in deciding how to vote his proxy" in the director elections. *Id.* at 798. Accordingly, as to this section 14(a) claim, it reversed and remanded

> "... for further proceedings consistent herewith, including a determination of whether the election of Zapata's directors should be nullified and whether the court should entertain jurisdiction over the pendent common law claims." *Id.*[15]

---

**14.** Judge Weinfeld had also held that the officers' July 2, 1974 option exercise was not " 'insider trading' " in violation of Rule 10(b), noting that both parties to the transaction were fully informed. 448 F.Supp. at 1039. The Second Circuit observed that Maldonado, et al. had not "challenged the district court's dismissal of their contention that the optionees violated Rule 10b–5 by trading on inside information." 597 F.2d at 791 n. 2.

As the Second Circuit further noted, Maldonado also failed to appeal Judge Weinfeld's dismissal of his claims under section 7 of the Exchange Act on the theory that the 1974 loans were illegal as violating the Federal Reserve margin requirements, because in any event "the Corporation suffered no damage from the alleged violation." *Id.*

**15.** The Second Circuit noted that its remand did not preclude the appellees from showing that a reasonable Zapata shareholder would not have considered it important, in voting for the election of directors, to know the matter omitted from the proxy statements concerning the 1974 stock option plan amendments. 597 F.2d at 798 n. 13.

Additionally, the Second Circuit affirmed Judge Weinfeld's dismissal of so much of Maldonado's action under section 14(a) and Rule 14a–9 as was grounded in the claim that " 'the failure of defendants to include the July 2, 1974 resolutions [amending the stock option plan and authorizing the loans] in the April 22, 1975 proxy statement prevented the shareholders from voting down the resolutions and preventing the losses complained of.' " 448 F.Supp. at 1040. The Second Circuit stated:

> "... we agree with the district court that this theory must be rejected since shareholder approval was unnecessary. Moreover, the

Following the remand, however, Maldonado, amended his New York complaint to delete the common law claims, and asserted a cause of action based solely on a violation of section 14(a). This amended complaint charged that the 1975 through 1978 proxy materials, used to secure the election of directors from 1975 through 1979, were materially misleading because they failed to disclose the circumstances surrounding the July 1974 modifications to the stock option plan.[16]

### E. CORPORATE MISMANAGEMENT; TEXAS ACTION.

Beginning in 1975, the net income of Zapata went into a decline. Yet, the management of Zapata, allegedly under the domination and control of Flynn, remained in power. On February 5, 1979, however, appellee John F. Maher ("Maher") filed this suit, in his own individual behalf, in the federal district court for the southern district of Texas against Zapata and Flynn.[17] Maher initially sought a preliminary injunction to prevent the 1979 annual shareholders' meeting, to be held on February 14, 1979, from taking place, on the ground that the proxy solicitation materials for it were materially misleading. Maher's application for an injunction, however, was denied.[18]

Later, in February 1979, Maher, joined by appellee Robert L. Easton (hereinafter referred to as the "plaintiffs"), converted his original action into a shareholders' derivative suit on behalf of all Zapata shareholders. This suit is referred to herein as the Texas action. Flynn, Gueymard, Israel, Lassiter, Mackin, Shiels, and Wall were made defendants. All claims on behalf of plaintiff Maher individually were deleted.

Plaintiffs' second amended complaint, their final pleading, was based mainly on alleged mismanagement of the Corporation by Flynn, and the claimed failure of Flynn's fellow officers and directors to properly superintend the affairs of Zapata and to exercise their independent business judgment. The allegations concerning Flynn charged

---

1975 proxy statement played no part in rendering the amendments legally effective." 597 F.2d at 795.

**16.** The amended complaint prayed for damages "as a result of the transactions complained of" and for injunctive relief. As to damages alleged to have been sustained by Zapata as a result of the stock option modifications and related transactions, Judge Weinfeld, in his opinion granting defendants' motion to strike Maldonado's jury demand following the remand, held, in effect, that section 14(a) could not be used to redress any alleged mismanagement or breach of fiduciary duty, but instead, with regard to damages, could only be used to recover out-of-pocket losses covered by violations of the proxy rules. He stated, "[i]f any damages are warranted in an improper election case, they are limited to out-of-pocket losses attributable to the improper election" and ". . . only the expense of a new [proxy] solicitation, strictly speaking, may be said to represent out-of-pocket losses attributable to the false proxy statement." *Maldonado v. Flynn,* 477 F.Supp. at 1010 (footnote omitted). The Second Circuit held that the jury demand was properly stricken. *See Maldonado v. Flynn,* 671 F.2d at 732.

**17.** Two other Zapata officers, Kelly and Gormley, were also made defendants; they were subsequently voluntarily dismissed when Maher's action was converted to a derivative suit.

**18.** The application was denied, following an evidentiary hearing (including testimony of Flynn, Mackin, a director, and Naess, formerly director and executive vice president), on the recommendation of Judge Black, who at that time was a United States magistrate for the southern district of Texas, and before whom the application was presented by agreement of the parties. Judge Black found, among other things, that:

"The Proxy Statement contains information concerning all compensation paid to officers, including Defendants here, and Plaintiff has failed to convince the Magistrate that the Proxy Statement contains erroneous information which would violate the rules applicable to information which must be included therein.
"....
"Plaintiff ordered a good deal of testimony about the 'illegal' loans to Defendant Flynn and other officers. Those loans were part of an over-all compensation plan approved for officers by Zapata's Compensation Committee and the plan included base pay, stock options and loans to facilitate the stock options. The plan was originally approved by the shareholders of Zapata although amended only by the Committee. The essential aspects of the compensation to officers were included in the December 21, 1978, proxy statement."

that he had set about to and did accomplish diverse self-serving objectives at Zapata's expense, including excessive employment contracts and salary bonus plans; lavish offices; improper use of the company airplane, yacht, and limousines; and improper use of a Zapata subsidiary to construct improvements on his personal residence. The complaint also charged that Flynn engaged in various schemes to perpetuate his domination of the board and his control of Zapata, including the removal of Naess and Harrison from Zapata's top management team and the purchase by Zapata of a large block of its stock owned by Crane Company. The other individual defendants were alleged to have violated their fiduciary duties to Zapata by acquiescing in, and in some cases participating in and benefiting from, Flynn's alleged derelictions. These allegations appeared in the "Background Facts" portion of the second amended complaint, where it was also alleged: that the directors, under the domination of Flynn, made "substantial changes" in the stock option plan "to the benefit of Flynn" (and "incidentally" of other officers and directors), and authorized interest-free loans by Zapata to Flynn and other officer and director optionees to fund their exercise of the stock options (all clearly referring to the July 2, 1974 board resolutions); that the directors also caused Zapata to loan "additional amounts" interest free to Flynn and the other optionees to cover their income tax liability incurred by exercising the options (referring to the March 1975 loans); and that "[t]he changes in the stock option plan and the interest free loans were to the detriment of Zapata" and a "wasting of Zapata's assets." No other Zapata loans to Flynn or other officers or directors were alleged. It was also stated that the 1977 and 1978 Zapata proxy statements failed to disclose several material items, including "[t]he true reasons for the amendments effected during July, 1974 to the company's stock option plan ... [which] permitted beneficiaries to profit at Zapata's expense through the use of inside information" and "[t]hat Zapata had made illegal loans to its officer-directors."

Following its "Background Facts" allegations, the second amended complaint expressly charged five separate and specific "cause[s] of action," each of which incorporated by reference the "Background Facts" allegations, as follows:

(1) Violations of section 14(a) of the Exchange Act based on the failure of Zapata's management to disclose in its 1977 and 1978 proxy solicitation materials for the election of directors in 1977, 1978, and 1979, the lack of independence of the board of directors, the degree of Flynn's domination over Zapata and the board, and the abuse of Zapata's assets permitted thereby.

(2) A violation of section 13(b)(2) of the Exchange Act, as amended by the Foreign Corrupt Practices Act of 1977, in that Zapata through its board and management, failed to comply with the record-keeping and reporting requirements of that section of the Act.

(3) A violation of section 13(a) of the Exchange Act, by failing to disclose material information necessary to make required statements in Zapata's form 10k annual report, filed December 21, 1978, with the Securities and Exchange Commission ("SEC") not misleading in connection with Zapata's impending purchase of a block of its stock (599,672 shares) from Crane Company, which was completed on January 22, 1979.

(4) "In making loans to its officer-directors and officers, Defendants violated Article 2.02A(6) of the Texas Business Corporation Act ('T.B.C.A.'), made applicable to Defendants by Article 8.02A, T.B.C.A."

(5) Violations of fiduciary duties by Zapata's directors because of their failure to diligently superintend the affairs of the Corporation; their failure to exercise their independent business judgment respecting corporate affairs; and their failure and refusal to adopt or implement controls adequate enough to prevent the waste of Zapata's assets.

Plaintiffs prayed for injunctive relief, actual damages of at least $50,000,000, puni-

tive damages also of at least $50,000,000, and attorneys' fees. Various depositions, including those of Flynn, Lassiter (president and director), and Maher, and other discovery (including several weeks of extensive document examination at Zapata's offices) ensued.

## F. THE OUSTER OF FLYNN.

On February 5, 1979, the same day that plaintiff Maher's original suit was filed, the board of directors placed Flynn on involuntary leave of absence. He was terminated for cause, effective April 15, 1979, and resigned from the board of directors on May 21, 1979. An executive committee composed of Mackin, Gueymard, and Lassiter performed Flynn's management responsibilities from February 5, 1979 until March 8, 1979, when Mackin became chairman of the board and chief executive officer.

After his termination, Flynn filed suit in the Delaware Chancery Court seeking an injunction against arbitration of matters respecting his employment contract with Zapata. On July 2, 1979, the parties settled this lawsuit. The settlement required present repayment of Flynn's loan (and certain other, relatively minor, advances) and settled for a discounted sum Flynn's claim on his employment contract which had some four more years to run. It discharged all other claims of the parties against each other except claims of Zapata not then known to its board of directors and claims asserted and which might be reduced to judgment on Zapata's behalf in the pending derivative suits, as well as claims Zapata might assert against Flynn as a result of a

particular nonderivative suit against Zapata.[19]

Flynn's loan was repaid in full on or before July 31, 1979. He died on October 31, 1981, and his executor was made a party to the Texas action.

## G. THE INDEPENDENT INVESTIGATION COMMITTEE.

On June 25, 1979, Zapata's board of directors created an independent Investigation Committee ("the Investigation Committee") to review and investigate the three derivative actions to determine whether they should be pursued against some or all of the defendants or terminated in whole or in part. As authorized by Delaware law,[20] the Investigation Committee was delegated the full power and authority of the board of directors to act for the Corporation in making the investigation and consequent determinations, including the authority to formally request, in the name of the Corporation, total or partial dismissal of any or all of these derivative suits. The Investigation Committee's actions and determinations were not subject to review by the board, and were binding on the Corporation. This Committee consisted of two disinterested directors, F. Arnold Daum and George A. Lorenz. Daum had become a director on May 25, 1979, and Lorenz on June 25, 1979. Neither Daum nor Lorenz were concerned in any of the transactions which were, in any way, the subject of the three derivative actions.

The Investigation Committee's investigation occurred between June 25, 1979 and September 21, 1979. In its Report and De-

---

**19.** An affidavit by Mackin reflects that this agreement encompassed matters beyond Flynn's employment contract:

"The settlement of William H. Flynn's contract dispute with Zapata Corporation (the Company) took into account certain claims of the Company against him. Those claims involved non-documented expense reports, personal use of Company assets and receipt of certain services from the Company at prices which did not reflect their market value. Mr. Flynn had approximately four years remaining on his employment contract with the Company at a minimum salary of $305,-000 per year. A settlement was reached with

Mr. Flynn on or about July 2, 1979 under circumstances whereby the Company paid to Mr. Flynn the sum of $215,115 (the discounted value on the settlement date of nine months salary) and received from Mr. Flynn the sum of $585,860 (repayment of an interest-free loan and certain advances)."

According to the record, Flynn "was advised that settlement took into consideration questionable items on past expense accounts and use of company assets."

**20.** See *Zapata Corp. v. Maldonado, supra,* 430 A.2d at 785–86.

termination of September 21, 1979, the Investigation Committee recommended that, in the best interest of Zapata, all three (Texas, New York, and Delaware) derivative actions against all the defendants should be terminated. Thereafter, at the direction of the Investigation Committee, Zapata's counsel filed motions for summary judgment, based upon the Committee's recommendation, in the Texas, New York, and Delaware actions. Discovery, including depositions of the members of the Investigation Committee and of the attorneys retained by the Committee to assist in its investigation, was then promptly undertaken jointly in the Texas, New York, and Delaware actions respecting the independence and good faith of the Committee, the nature and extent of its investigation, and the bases for its recommendations.

## H. DISPOSITION OF THE NEW YORK AND DELAWARE ACTIONS.

In Maldonado's New York action, following the 1979 remand by the Second Circuit, Judge Weinfeld, on January 24, 1980, granted Zapata's motion for summary judgment based on the Investigation Committee report. *Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y.1980). Judge Weinfeld held that "under Delaware law a committee of disinterested directors, properly vested with the power of the board, may in the exercise of their business judgment require the termination of a derivative suit brought on the Corporation's behalf . . . ." 485 F.Supp. at 279. Judge Weinfeld then determined that the Investigation Committee had acted, af-

ter appropriate investigation, in the good-faith exercise of its independent business judgment, and he dismissed the action.[21] Maldonado appealed the dismissal to the Second Circuit.

In the Delaware Court of Chancery, however, Zapata's motion for summary judgment was denied on March 18, 1980. *Maldonado v. Flynn,* 413 A.2d 1251 (Del.Ch. 1980). There, Vice Chancellor Hartnett held that the business judgment rule had no application to the termination of a derivative action brought against the Corporation's directors and officers. He therefore did not reach the question of the Investigation Committee's good faith and independence, or the propriety of its investigation and recommendation. Zapata appealed this ruling to the Supreme Court of Delaware.

However, shortly thereafter, on May 29, 1980, the Vice Chancellor granted Zapata's motion to dismiss the Delaware action based on Maldonado's failure to assert his common law theories of recovery in the New York action. *Maldonado v. Flynn,* 417 A.2d 378 (Del.Ch.1980). The Vice Chancellor held that the causes of action asserted by Maldonado in the New York and Delaware actions arose out of the same underlying transaction; that Maldonado had impermissibly split his claim; and that the dismissal in the New York action precluded his prosecution of the common law theories of recovery in the Delaware courts. *See* note 13, *supra.* The Vice Chancellor, however, stayed the dismissal pending the outcome of Maldonado's appeal to the Second Circuit.

---

**21.** Judge Weinfeld stated, "the record reflects that the investigative procedures employed by the Committee were searching, comprehensive, and took into account significant factors appropriate to an impartial and objective business judgment," 485 F.Supp. at 284, and:

"In sum, the Court finds that the Committee, composed of independent and disinterested directors, conducted a proper review of the matters before it, considered a variety of factors and reached, in good faith, a business judgment that this action was not in the best interest of Zapata." *Id.* at 286 (footnote omitted).

Judge Weinfeld also observed that there was "not a scintilla of evidence to sustain a charge of bad faith with respect to its [the Committee's] judgment" nor "an iota of proof to impugn the independence, the disinterestedness or the good faith of the Committee." *Id.* at 285. And, he remarked on the facts which indicated that "the Committee's members were independent of the remainder of the board both formally in terms of the Committee's power and personally in terms of their relationships with the company and its directors" and which "also establish that neither [Committee member] had a disqualifying personal interest in the outcome of the Committee's decision." *Id.* at 283.

On May 13, 1981, the Supreme Court of Delaware sustained Zapata's interlocutory appeal from the Vice Chancellor's denial of its motion for summary judgment based on the recommendation of the Investigation Committee. *Zapata Corporation v. Maldonado,* 430 A.2d 779 (Del.1981). The Supreme Court held that a corporation, acting through an independent committee, *could* cause the termination of litigation brought on its behalf, subject to court approval. In passing on such a motion to terminate, the trial court should apply a two-step test, first determining whether the committee was truly independent and acted in good faith on reasonable investigation, and, second, whether in the court's own independent business judgment the motion should be granted.[22]

The Delaware Supreme Court therefore reversed the Vice Chancellor's order denying Zapata's motion for summary judgment and remanded the case for further proceedings consistent with its opinion.

## I. THE TEXAS SETTLEMENT.

Meanwhile, in the Texas action, on May 27, 1980, Zapata's motion for summary judgment was also denied by Judge Black. The denial was based upon Vice Chancellor Hartnett's March 1980 ruling in the Delaware action. *Maher v. Zapata Corporation,* 490 F.Supp. 348, 351–53 (S.D.Tex.1980). No appeal by Zapata was taken from this ruling. Thereafter, additional discovery was pursued in the Texas action, including the depositions of Israel (outside director) and Wall (Zapata's chief financial officer). Before the Supreme Court of Delaware rendered its decision respecting the business judgment rule, but after Judge Black had denied Zapata's motion thereon in the Texas action, the parties to the Texas action entered into settlement negotiations, which resulted in a Stipulation and Agreement of Compromise and Settlement on September 15, 1980. Notice of the settlement was given all Zapata's shareholders pursuant to Fed.R.Civ.P. 23.1, and Judge Black held a hearing where Maldonado appeared individually as an objector and presented his objection to the settlement agreement, the principal basis of which was the potential *res judicata* effect of the settlement on the claims respecting the July 1974 modifications to the stock option plan pending in his Delaware action.[23]

Judge Black, however, held that the potential preclusive effect of the settlement was not a determining factor. He found that there were no signs of bad faith or collusion between the parties, and that the settlement was fair, reasonable, and in the best interest of Zapata. The settlement agreement was approved on June 12, 1981, and Maldonado alone then brought this appeal.

**22.** The Delaware Supreme Court stated:

"After an objective and thorough investigation of a derivative suit, an independent committee may cause its corporation to file a pretrial motion to dismiss in the Court of Chancery. The basis of the motion is the best interests of the corporation, as determined by the committee.... The Court should apply a two-step test to the motion.

"First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions.... The corporation should have the burden of proving the independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion to the next step.

"... The Court should determine, applying its own independent business judgment, whether the motion should be granted." 430 A.2d at 788–89 (footnotes omitted).

**23.** At no time did Maldonado attempt to intervene in the Texas action as a plaintiff, or seek to consolidate the New York and Texas actions.

Zapata's brief asserts, and Maldonado has not denied, that Maldonado owns less than twenty-two ten-thousandths of one percent (.000022) of the outstanding Zapata shares (*i.e.,* less than 235 shares out of the approximately 10,600,000 outstanding in September 1980).

## J.  THE SECOND CIRCUIT.

While the events described above were taking place in Delaware and in Texas, the Second Circuit was considering Maldonado's appeal from Judge Weinfeld's January 1980 dismissal of the New York action based on the Investigation Committee's recommendation.  After the Texas action was dismissed with prejudice by Judge Black pursuant to his approval of the settlement agreement, Zapata, as Maldonado feared, argued to the Second Circuit that the continuation of the New York action was barred by the judgment in the Texas action.  In its February 1982 decision, the Second Circuit, however, after noting the approval of the settlement agreement by Judge Black and the Supreme Court of Delaware's decision respecting the business judgment rule, remanded the case to Judge Weinfeld to address the *res judicata* effect of the Texas settlement judgment and, to the extent it did not have preclusive effect, to determine in his business judgment whether Zapata's motion to terminate the case should be granted.  It specifically affirmed Judge Weinfeld's findings (*see* note 21, *supra*) that the Investigation Committee acted "truly independently and in good faith" in recommending termination.  *Maldonado v. Flynn*, 671 F.2d 729 (2d Cir.1982).  Apart from *res judicata*, "all that remains" for Judge Weinfeld on remand will be the second step in the Delaware two-step process (*see* note 22, *supra*), namely, application of his own independent business judgment to whether the Committee's recommendation should be granted.

The first step in that two-step process, establishing the Committee's independence, good faith, and reasonable investigation and bases for its conclusions, has already been satisfied.[24]

## K.  POSTURE OF THE ACTIONS.

The present posture of the several actions is accordingly as follows.  When the instant appeal is decided, Judge Weinfeld, in accordance with the Second Circuit's remand, will proceed to determine first, whether any, all, or part of the New York action is precluded by the Texas settlement judgment, providing it is upheld by this Court, and then, if necessary, whether, in his own independent business judgment, it is in the best interest of the Corporation to grant Zapata's motion for summary judgment based on the Investigation Committee's recommendation (already established to have been independent and appropriately arrived at in good faith) that the New York action be terminated.

If the New York action is dismissed, then the Vice Chancellor will dismiss the Delaware action on the basis of *res judicata*.  If, however, the New York action is *not* dismissed, then the Vice Chancellor, in accordance with the Supreme Court of Delaware's remand, will determine whether Zapata's motion for summary judgment, based on the Investigation Committee's recommendation that the Delaware action be terminated, should be granted or denied.

**24.**  The Second Circuit stated:

"The case will therefore be remanded to allow Judge Weinfeld to determine in the first instance, after the Fifth Circuit has rendered its decision, what effect the Texas settlement has on this action.

"Should Judge Weinfeld determine that all or part of this action is not precluded by the Texas settlement, he may proceed to apply Delaware law as enunciated in *Zapata*.  To simplify this task, we provide the following guidance.  We have already held in *Abramowitz v. Posner* [672 F.2d 1025 (2d Cir. 1982)], also filed today, that the Delaware law is consistent with the policies underlying section 10(b) of the Securities and Exchange Act of 1934.  For the reasons set forth in *Abramowitz* as well as for the sound considerations discussed by Judge Weinfeld in his decision below, we hold that the Delaware law is consistent with the policies underlying section 14(a) as well.  Moreover, *we affirm Judge Weinfeld's findings that the board members who recommended termination of this suit acted truly independently and in good faith.  Thus, all that remains for the district court, should it find that this suit is not barred by res judicata, is to determine, in its own independent business judgment, whether Zapata's motion to terminate this action should be granted.*

" . . . .

"The judgment is reversed *in part* and the case is remanded for proceedings in accordance with this opinion."  671 F.2d at 731–32 (emphasis added).

With the actions in this setting, we now turn to consider whether the judgment approving the settlement of the Texas action should be affirmed.

## II.

### NOTICE

■ Nonparty shareholders must be given notice of the proposed settlement of a shareholders' derivative action. *Papilsky v. Berndt,* 466 F.2d 251, 258 (2d Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665 (1972). Rule 23.1, Fed.R.Civ.P., provides that the district court shall direct the manner in which this notice should be given, and that the derivative action shall not be dismissed without the district court's approval of the settlement agreement.

Here, the district court, on September 15, 1980, approved the form of the notice sent to all Zapata shareholders of record as of September 5, 1980. The notice advised the shareholders that a hearing to determine whether the proposed settlement should be approved would be held on October 8, 1980.[25] The shareholders were told that they could appear at this hearing and show cause why the settlement agreement should not be approved, and "why all claims asserted or which could be asserted on behalf of Zapata should not be dismissed according to its terms . . . ." The notice summarized the parties' contentions, the issues involved in the case, and the terms of the settlement agreement, including the fact that "[a]ll claims on behalf of Zapata which were or could have been asserted against the individual-defendants are to be dismissed with prejudice." The effect of the settlement agreement, should it obtain the court's approval, was stated in the notice as follows:

"If a final judgment is entered approving the Settlement Agreement, such judgment will bar any further actions against any of the defendants arising out of or related to the matters set forth in the Second Amended Complaint on file

with the Court or which could have been raised in this action."

The notice cautioned the shareholders that the references to the settlement agreement, the pleadings, and other documents were "only summaries," and also informed them that copies of the entire settlement agreement were available upon request, and that the pleadings, documents, and depositions on file with the court, or in the parties' possession, were open for examination.

In response to the notice, the district court and counsel for the parties received objections from several shareholders, all, except for Maldonado, basing their objections primarily on the provision of the settlement agreement respecting attorneys' fees to be paid plaintiffs' attorneys. Maldonado, however, was the only objecting shareholder to appear, in person or through counsel, at the settlement hearing to argue his objections to the district court. One of his objections concerned the sufficiency of the notice of settlement sent to the shareholders. The district court, however, rejected this objection by finding that the shareholders "were provided adequate notice of the proposed settlement, its terms and its legal effects."

Maldonado contends here that the notice was defective, concerning his own New York and Delaware derivative actions, because it failed to disclose: (1) their existence and the claims asserted therein; and (2) that Zapata and the individual defendants would use the release provision of the settlement to attempt to bar their continuation. Maldonado further contends that the notice was defective, concerning the Texas action, because it failed to inform the shareholders of the grounds for the claims asserted therein and the circumstances under which they arose, of the relief sought or of the possibility of successful prosecution of the action, and of the benefits which had

---

**25.** On October 21, 1980, however, the district court adjourned the settlement hearing until the fifteenth day after the Supreme Court of Delaware rendered its written decision in *Zapa-* *ta Corp. v. Maldonado,* 430 A.2d 779, which was handed down on May 13, 1981. The settlement hearing resumed on May 28, 1981.

accrued to Zapata as a result of it. We disagree with all of Maldonado's contentions for the following reasons.

■ First, the notice sent to the shareholders was sufficient, and did not violate their due process rights. The notice as given was plainly within the bounds of the district court's discretion. *In re Four Seasons Securities Laws Litigation,* 525 F.2d 500, 503 (10th Cir.1975). *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 636 (N.D.Cal. 1978), *aff'd,* 645 F.2d 699 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981). The notice adequately described the nature of the pending action, the claims asserted therein,[26] and the general terms of the proposed settlement. It informed the shareholders that additional information was available from the court's files. It also informed them of the time and place for the settlement hearing and their right to participate therein. *Miller v. Republic National Life Insurance Company,* 559 F.2d 426, 429 (5th Cir.1977); *Reynolds v. National Football League,* 584 F.2d 280, 285 (8th Cir.1978). *See also Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176–77 (5th Cir.1975), *cert. denied, sub nom., Skydell v. Ecological Science Corp.,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); *Brucker v. Indian Head, Inc.,* 424 F.Supp.

679, 688 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1202 (2d Cir.), *cert. denied, sub. nom., Rome v. Indian Head, Inc.,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977). In view of this information, it is clear that the essential purpose of the notice, with regard to the shareholders' due process rights, "namely, to fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them . . ." was satisfied.[27] *Greenspun v. Bogan,* 492 F.2d 375, 382 (1st Cir.1974), quoting *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. 364, 378 (E.D.Pa.1970), *aff'd, sub nom., Ace Heating & Plumbing Company v. Crane Company,* 453 F.2d 30 (3d Cir.1971). And, in any event, the notice provided the shareholders with sufficient information for them to make a "rational decision whether they should intervene in the settlement approval procedure." Wright & Miller, Federal Practice & Procedure: Civil § 1839 (1972).

■ Second, as concerns the *res judicata* implications of the settlement, we feel that the notice was so worded as to make reasonably clear to the "minimally sophisticated layman," *Milstein v. Werner,* 57 F.R.D. 515, 518 (S.D.N.Y.1972), that approval of the settlement would bar claims beyond

---

**26.** The notice stated, among other things, that plaintiffs charged:

"... that damages were sustained by Zapata as a result of mismanagement of the Company's affairs, waste of corporate assets, breach of fiduciary duties owed to the Company and violations of the federal securities laws and state laws. The Complaint charges that employment contracts, bonus and option arrangements, salary increases, interest-free loans, uses of Company credit with banks, expensive offices, corporate aircraft, a yacht and a limousine and other assets were obtained and used by Mr. Flynn and other officers as compensation which was allegedly excessive and not properly reported as compensation; that Mr. Flynn used various means, including a failure to nominate additional outside directors and discharging persons who disagreed with him, in order to maintain his control over the Company; that Mr. Flynn had become unable to carry out his functions and his conduct was causing injury

to the Company's reputation and the morale of its officers and employees; that accounting irregularities of various kinds had occurred and illegal foreign payments had been made; that improper purchases of the Company's stock were made or attempted in order to secure Mr. Flynn's position in the Company; that the defendant-directors participated in or failed to investigate such matters and take corrective action and the prior proxy statements were deficient for failure to disclose such matters."

**27.** Other purposes sought to be satisfied by the notice requirement of Rule 23.1 are (1) to prevent unjust or collusive settlements, *Rogosin v. Steadman,* 71 F.R.D. 514, 520 (S.D.N.Y.1976); *Schlusselberg v. Colonial Management Associates, Inc.,* 389 F.Supp. 733, 741 (D.Mass.1974); and (2) to encourage those with divergent views to come forth, thus helping the court to identify possible inadequacies in the settlement, *Cohen v. Young,* 127 F.2d 721, 725 (6th Cir.1942).

those asserted in the Texas action.[28] The notice is not required to eliminate "all occasion for diligence on the part of the stockholders." Haudek, *The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement*, 23 Sw.L.J. 765, 787 (1969) (footnote omitted). *See Braun v. Fleming-Hall Tobacco Company*, 33 Del.Ch. 246, 92 A.2d 302, 309 (1952). *See also Prince v. Bensinger*, 244 A.2d 89, 92 (Del.Ch.1968), and cases cited therein. The notice to the shareholders need not explain to them all the consequences involved in the settlement. It is not required to provide a complete source of settlement information, *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 n. 1 (9th Cir.1977), and the shareholders are not expected to rely on it *as such*. *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Rubenstein v. Republic National Life Insurance Company*, 74 F.R.D. 337, 348 (N.D.Tex. 1976), *aff'd sub nom., Miller v. Republic National Life Insurance Company*, 559 F.2d 426 (5th Cir.1977). By telling the shareholders that the descriptions were "only summaries" and the court files were open for inspection, the notice implicitly invited them to conduct a further investigation, if they so desired, on the basis for, the background of, and the legal implications of the settlement. *In re Four Seasons*, 525 F.2d at 503.

Third, as concerns the failure of the notice to discuss Maldonado's New York and Delaware derivative actions, we think Maldonado's arguments ignore the other information made available to the shareholders regarding those actions. Since January 1976, proxy solicitation materials sent to the shareholders by Zapata's management have contained sections discussing first the Delaware action, and then, after December 1977, the New York action. Furthermore, after notice of the settlement had been sent to the shareholders in September 1980, but before the settlement hearing was reconvened in May 1981, the shareholders were sent Zapata's proxy solicitation materials (dated February 20, 1981), which summarized the nature of, and the events which had taken place in, all three derivative actions; described the terms of the proposed settlement in the Texas action; and stated that the settlement hearing had been continued pending resolution of Zapata's appeal to the Supreme Court of Delaware respecting the denial of its summary judgment based on the recommendation of the Investigation Committee. While we do not hold that such information can displace or perform the function of a shareholders' notice issued pursuant to Rule 23.1, we do recognize that pertinent information received from other sources may, as here, supplement the shareholders' knowledge regarding the settlement and thus render certain omissions or deficiencies less serious, misleading, or harmful. *See Milstein v. Werner*, 57 F.R.D. at 517–18; *Boggess v. Hogan*, 410 F.Supp. 433, 443 (N.D.Ill.1975). *See also Bernstein v. Mediobanca Banca di Credito Finanziario-Societa Per Azioni*, 78 F.R.D. 1, 3 (S.D.N.Y.1978).

Further, we feel that Maldonado's attendance at the settlement hearing substantially fulfilled another important purpose of the notice provision of Rule 23.1, namely, affording the district court the opportunity to receive the benefit of "that broader information which comes from receiving advice as to the views of all parties concerned and from considering evidence proffered by them upon the relevant points of the case." *Cohen v. Young*, 127 F.2d 721, 725 (6th Cir.1942). *See also Papilsky v. Berndt*, 466 F.2d at 258.

Here, Maldonado appeared as an objector in the settlement proceeding. Represented by capable counsel, he filed two briefs in opposition to the settlement and appeared at the settlement hearing where he voiced his objections, emphasizing primarily the *res judicata* problems with the settlement. Thus, the shareholder in the strongest position to apprise the district court of the *res*

---

**28.** We observe that the language used in the notice to describe the legal effect of the provision of the settlement agreement respecting the further prosecution of other claims is actually broader than the language of the provision itself.

*judicata* implications and problems with the settlement agreement actually appeared and pressed his objections, both orally and in writing, upon the district court. *See In re Equity Funding Corporation of America Securities Litigation,* 603 F.2d 1353, 1361–62 (9th Cir.1979). Clearly, Maldonado adequately served as a spokesman for the views of potentially objecting absent shareholders in this proceeding, at least with respect to the possible effect of the settlement on the New York and Delaware actions.

■ Moreover, there is no indication that any shareholder, including Maldonado himself, has suffered any prejudice because of the alleged deficiencies in the notice. *See Masterson v. Pergament,* 203 F.2d 315, 330 (6th Cir.), *cert. denied,* 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953). We recognize that a shareholder-objector in the position of Maldonado, who because of his related actions is more interested than other shareholders in the settlement proceedings, may raise the objection that the notice sent to all shareholders is defective, *see Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 833 (3d Cir.1973); *Birnbaum v. Birrell,* 17 F.R.D. 409, 412 (S.D.N.Y.1955). We nevertheless hold that the absence of any claim of prejudice is a circumstance favorable to the sufficiency of the notice where, as here, no claim of prejudice has been made, especially in view of the length of time between the notice and the hearing, and the other information made available to the shareholders by the proxy solicitation materials and the like. *See Miller v. Republic National Life Insurance Company,* 559 F.2d at 430; *Milstein v. Werner,* 57 F.R.D. at 517–18.

In summary, while perhaps the contents of the notice here could have been enlarged to reflect those matters Maldonado insists it should have included, we conclude that the notice imparted information to the Zapata shareholders which, under all the circumstances, was sufficient to satisfy "the demands of due process" and the purposes of Rule 23.1. *Airlines Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 455 F.2d 101, 108 (7th Cir. 1972).

III.

**APPROVAL OF THE SETTLEMENT**

The terms of the settlement agreement were as follows:

(1) That "all claims on behalf of Zapata asserted or which could have been asserted in this lawsuit against the individual defendants are to be dismissed with prejudice";

(2) That Maher's individual action against Zapata in the Texas state court, and Zapata's actions against him and several other defendants in the New York federal district court, were to be dismissed; [29]

(3) That plaintiff's counsel would apply for attorneys' fees not to exceed $400,000 plus $26,000 in expenses, and that Zapata would not oppose an award of $250,000, plus $18,560 in expenses.

The district court's judgment states that "the proposed settlement agreement is approved as being fair, reasonable, and adequate and in the best interest of Zapata Corporation" and "[t]his action is dismissed with prejudice as to all defendants." [30]

---

**29.** Maher's suit in the state district court of Harris County, Texas, against Zapata was originally filed in January 1979, and sought a list of Zapata shareholders. Thereafter, Zapata sued Maher (and Easton and their attorneys) in the southern district of New York alleging that Maher's purpose in examining the stockholder list was improper and/or improperly disclosed and that defendants during or prior to January 1979 formed a group to solicit proxies to get control of Zapata or place some of them on the board without notifying the SEC, contrary to section 13(d) of the Exchange Act. This suit

sought injunctive relief against the continuation of such actions. Whatever their respective technical merits, it appears plain that Maher's individual suit, and that by Zapata against him (and Easton and their attorneys), were in substance essentially interrelated minor tactical appendages to the main suit that was pending before Judge Black.

**30.** The judgment also awarded plaintiffs' counsel $250,000 fees and $18,560 expenses.

■ The burden of showing that a proposed settlement of a shareholders' derivative action is fair, reasonable, and adequate, and that acceptance of its terms is in the best interest of the Corporation and its shareholders, is on the proponents of the settlement, as Judge Black explicitly recognized in his approval order. *Greenspun v. Bogan,* 492 F.2d at 378; *Berger v. Dyson,* 111 F.Supp. 533, 535 (D.R.I.1953). In discharging their burden here, the proponents of the settlement (plaintiffs, Zapata, through its independent Investigation Committee, and defendants) filed affidavits of Mr. Jess Hall, counsel for plaintiffs, and Mr. F. Arnold Daum, the chairman of the Investigation Committee.

Hall's affidavit recited the extensive discovery and investigation that had taken place in connection with the prosecution of the Texas action, and the benefits which had resulted to Zapata from its commencement and maintenance. It also discussed the legal and factual obstacles facing plaintiffs in connection with each of their five causes of action. Daum, in his affidavit, also set forth the factors, both legal and factual, which militated against continuation of the action. Both Hall and Daum concluded, in effect, that the plaintiffs' chances for recovery were poor, and that, in any event, the monetary damages that might be recovered after a trial on the merits would not justify the attendant legal and business costs to Zapata.

In opposition to the settlement, with regard to fairness, Maldonado, in an affidavit filed by his counsel, maintained that it was "nothing more than a voluntary dismissal without any consideration to be received by Zapata in exchange for the relinquishment of its claims asserted on its behalf against the defendants." Maldonado also objected to the proponent's failure to "come forward with any evidence as to the possibility of recovery in [plaintiffs'] causes of action, or the amount of such recovery that will enable [the district court] to weigh the fairness of such settlement."

The district court, in its June 12, 1981 Memorandum and Order approving the settlement, after reciting that it had considered all the pleadings, briefs, affidavits, letters from objectors, and the argument of counsel for all parties and for Maldonado, made the following findings:

"(2) The settlement agreement was the result of arm's length negotiation, after extensive discovery on the merits and intelligent evaluation of the lawsuit by the parties and their counsel. The lawsuit was vigorously prosecuted by the plaintiff. There are no signs of bad faith or collusion between the parties.

"(3) The Independent Investigation Committee endorses and supports the settlement.

" . . . .

"(5) This lawsuit was at least a contributing factor in several major beneficial changes in Zapata Corporation, including the removal of William H. Flynn on February 5, 1979, as Chairman of the Board and Chief Executive Officer of Zapata; a new emphasis on maximization of presently owned businesses rather than the acquisition of increasingly diverse businesses; an advantageous settlement of Mr. Flynn's employment contract dispute; the implementation of stricter policies regarding the use of Zapata property and facilities; and the development of new accounting and internal control procedures. Zapata stock increased in price from $12 in January 1979 to $55 in August 1980. After a stock split early in 1981, it is still selling at about $23 per share.

"(6) The parties' conclusion, that any possible benefit to Zapata from pursuing the remaining causes of action could be more than offset by the additional cost of litigation, is based on an intelligent and prudent evaluation of their case.

"(7) Based on the above-listed factors, this Court finds that the proposed settlement of this case is reasonable, adequate and fair to all parties and in the best interests of Zapata Corporation."

The court specifically noted that the proponents of the settlement had met their burden of proving, and had demonstrated to

the court's satisfaction, that the proposed settlement was fair, adequate, and in the best interest of Zapata Corporation.

## A. STANDARD OF REVIEW.

Settlements of shareholder derivative actions are particularly favored because such litigation is "notoriously difficult and unpredictable." *Schimmel v. Goldman,* 57 F.R.D. 481, 487 (S.D.N.Y.1973); *Republic National Life Insurance Company v. Beasley,* 73 F.R.D. 658, 667 (S.D.N.Y.1977); Haudek, 23 Sw.L.J. at 793. The courts, therefore, do not lightly reject such settlements. *See Florida Trailer & Equipment Company v. Deal,* 284 F.2d 567, 571 (5th Cir.1960). Before approving the settlement of a shareholders' derivative action, however, the district court must determine that there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable, and adequate. *Young v. Katz,* 447 F.2d 431, 433 (5th Cir. 1971); *Miller v. Republic National Life Insurance Company,* 559 F.2d at 428–29. In making these determinations, the district court enjoys wide discretion, and in exercising its discretion, the court should not decide the merits of the action or attempt to substitute its own judgment for that of the parties.[31] *Lewis v. Newman,* 59 F.R.D. 525, 527 (S.D.N.Y.1973). The district court's approval of a settlement agreement is not therefore to be disturbed unless the court "clearly abused its discretion." *Young,* 447 F.2d at 432; *Miller,* 559 F.2d at 429.

However, the court, upon consideration of a proposed settlement, must state its reasons for approving it and should examine a proposed settlement in light of the objections raised to it, and set forth with sufficient detail a reasoned response to them, including supportive findings of fact and conclusions of law as may be necessary, so that an appellate court, in the event of an appeal, will have a basis for conducting a meaningful review of the exercise of the district court's discretion. *Cotton v. Hinton,* 559 F.2d 1326, 1330–31 (5th Cir.1977).

Before discussing Maldonado's various particular contentions, we note at this point certain factors specially applicable to this case which in combination weigh significantly in favor of affirmance of Judge Black's approval of the settlement.

To begin with, important aspects of this case have already been ruled on by Judge Weinfeld and the Second Circuit. While we do not find it necessary to definitively determine the point, it would seem most likely that these rulings in the New York action are binding in the Texas action under principles of *res judicata,* collateral estoppel, or law of the case.[32] At the very least, they are extremely persuasive. And, Maldonado, though afforded ample time and opportunity, presented no evidence compelling conclusions contrary to those reached in the New York action (nor anything of substance not available to Judge Weinfeld). Central to Maldonado's claims is his complaint of the July 2, 1974 board action accelerating the exercise date for the final twenty percent installment of the stock options. The same resolution approved the interest-free loans to exercise the options and to cover the optionees' resulting tax liability. Judge Weinfeld and the Second Circuit have ruled, following Maldonado's completion of discovery, that the resolution accelerating the exercise date was legally enact-

---

31. In other words, in determining the fairness, reasonableness, and adequacy of a proposed settlement, neither the district court nor the appellate court on review, should reach ultimate conclusions on the issues of fact and law underlying the dispute. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 n. 69 (5th Cir.), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1978).

32. *See Cramer v. General Tel. & Elec. Corp.,* 582 F.2d 259, 266–68 (3d Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Goldman v. Northrop Corp.,* 603 F.2d 106, 109 (9th Cir.1979); *Shlensky v. Dorsey,* 574 F.2d 131 (3d Cir.1978). *See also Matter of Penn Cent. Transp. Co.,* 560 F.2d 169, 178 n. 14 (3d Cir.1977); *Antonioli v. Lehigh Coal & Nav. Co.,* 451 F.2d 1171, 1176–78 (3d Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); *Goodrich v. Supreme Court of State of S.D.,* 511 F.2d 316, 318 (8th Cir.1975); *Southard v. Southard,* 305 F.2d 730, 732 (2d Cir.1962).

ed by fully informed disinterested board members not acting under the control or domination of the optionees (see text at note 14, supra). In such circumstances, the "business judgment rule" stands as a most formidable barrier to successful resolution on the merits of a cause of action based on the option acceleration.[33] Moreover, Judge Weinfeld and the Second Circuit have likewise ruled that the Investigation Committee was disinterested and acted independently, in good faith, and upon proper investigation and bases in its recommendation that continuation of the derivative actions was not in the best interest of Zapata, so as to fulfill "step one" of the two-step process mandated by the Delaware Supreme Court (see notes 21, 22, and 24, supra). The recommendation of such a Committee is indeed most persuasive and entitled to great weight.[34] To be sure, it is not controlling,

for the district court is to furnish "the fresh view of a judicial outsider" and apply "its own independent business judgment." Zapata Corp. v. Maldonado, 430 A.2d at 788–89. The "second step is intended to thwart instances where corporate actions meet the criteria of step one [independent Committee recommendation], but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance . . . ." Id. at 789. But this does not suggest that the independent Committee's views are not of great significance; rather, that they are not beyond judicial control. Such control, in turn, is committed to the trial court's "independent discretion." Id. at 788.

Other factors favoring approval of the settlement here are the minimal nature of shareholder objection[35] and the district

---

**33.** We do not read Galef v. Alexander, 615 F.2d 51 (2d Cir.1980), decided by a different Second Circuit panel, as reflecting a contrary understanding of Maldonado v. Flynn, 597 F.2d 789 (2d Cir.1979). Galef was a derivative action against all TRW directors alleging common law and Exchange Act claims on account of stock options granted six directors and related proxy statements. The Court observed that the business judgment rule generally shielded from judicial inquiry the business decisions taken in good faith by disinterested directors, 615 F.2d at 57, and that this principle extended to decisions whether to bring suit: "[t]he principle that disinterested directors may prevent pursuit of a claim of the corporation in a stockholder derivative action is itself referred to as the business judgment rule." Id. at 58. However, the Court nevertheless held that the trial court erred in dismissing the action on account of the nonoptionee directors' refusal of plaintiff's demand for suit, because the directors who voted to do so were defendants in the action, some having approved the options and others the proxy statements, stating:

"... in each [case relied on by the trial court] the directors who made such a determination were not alleged to have authorized or approved the challenged transaction, and they were not made defendants to the lawsuit. We are not aware of any case that has determined that directors against whom a claim has been asserted and who have determined that the claim against them should not be pursued, do not 'stand in a dual relation which prevents an unprejudiced exercise of judgment.'" Id. at 60 (footnotes omitted).

In a footnote to the last-quoted sentence, the Court stated that TRW's reliance on Maldona-

do was "misplaced" since Maldonado did not involve "a motion to dismiss on the basis of the business judgment rule," but was rather a decision on the merits. Id. at 60, 61 n. 8. "Maldonado did not purport to define disinterest for the quite different purposes of the business judgment rule." Id. Clearly, the latter passage from Galef (like the above-quoted passage thereof at 615 F.2d 58) is using the "business judgment rule" to refer to director decisions not to pursue the litigation in question (in which they are defendants), rather than to director decisions concerning matters not relating to any litigation pending or threatened when the decision was made. Galef does not purport to say that the nonoptionee directors in Maldonado, who voted for the option acceleration, were insufficiently disinterested in that decision to prevail, in a suit questioning it, on the merits by virtue of the "business judgment rule"; but rather, that such directors were insufficiently disinterested in determining whether a suit against them would be pursued to make that decision under the scope of the business judgment rule (and, of course, we do not suggest the contrary).

**34.** Susquehanna Corp. v. Korholz, 84 F.R.D. 316, 321 (N.D.Ill.1979); Republic Nat. Life Ins. Co. v. Beasley, 73 F.R.D. at 668–69; Stull v. Baker, 410 F.Supp. 1326, 1336 (S.D.N.Y.1976); Berger v. Dyson, 111 F.Supp. at 535.

**35.** Numerous cases have recognized that, though not controlling, this is a factor to be considered. Cotton v. Hinton, 559 F.2d at 1331; Greenspun v. Bogan, 492 F.2d at 379–80; Susquehanna Corp. v. Korholz, 84 F.R.D. at

court's finding, adequately grounded in the record, that the settlement was the result of arm's-length negotiation, after extensive discovery and intelligent evaluation of the lawsuit by the parties and their capable counsel.[36]

We also note that Maldonado had ample time and opportunity to make a full evidentiary presentation in support of his objections. However, he chose not to do so, and relied instead almost entirely upon a 1979 affidavit of his counsel submitted in the Delaware action. He brought nothing of factual substance to the district court's attention not otherwise available to it and the parties to the Texas action. He made no evidential contravention of the submission on behalf of the settlement's proponents.

Finally, there is the long pendency not only of the New York and Delaware actions, but also of the Texas action. The district court's findings and conclusions in this case are bolstered by Judge Black's long and intimate acquaintance with the lawsuit from its inception, first as a United States magistrate and then as district judge. On several occasions, more often than one might suppose would normally be the case, he was called upon to rule on

diverse discovery and ancillary matters, as well as on motions more closely related to the merits. He was quite familiar with the action and in a unique position to evaluate the context, process, and nature of the settlement.[37] *See United Founders Life Insurance Co. v. Consumers National Life Insurance Co.,* 447 F.2d 647, 655 (7th Cir.1971).

## B. COLLUSION.

■ A district court must reject a settlement agreement no matter how acceptable it may otherwise be, if it is not free from collusion or fraud. *Saltzman v. Technicolor, Inc.,* 51 F.R.D. 178, 186 (S.D.N.Y. 1970); Haudek, 23 Sw.L.J. at 772. As noted above, the district court here found, in effect, that the settlement was free from collusion between the parties.

Maldonado's main contention respecting collusion is that, as stated in the objection he filed below, "the proposed settlement is a fraudulent means by which defendants are attempting to obtain a 'blanket release' from all claims asserted in stockholders' derivative actions brought on behalf of Zapata against directors and former directors for no consideration." [38]

---

321; *Republic Nat. Life Ins. Co. v. Beasley,* 73 F.R.D. at 668; *Stull v. Baker,* 410 F.Supp. at 1333; *Berger v. Dyson,* 111 F.Supp. at 535.

**36.** *See Susquehanna Corp. v. Korholz,* 84 F.R.D. at 321; *Stull v. Baker,* 410 F.Supp. at 1332–33.

**37.** Judge Black stated at the conclusion of the May 1981 final hearing on the settlement:

"I have lived with this case since the plaintiffs' original complaint was filed and I note that the last instrument in the file is Number 145. This has been a long, complex matter.

"I can assure counsel that I have read every single instrument that is of any reasonable relevance. I firmly believe that it is to the best interest of the corporation and its stockholders that this matter be resolved; and that it be settled; that it be disposed of; and I am going to approve the settlement."

**38.** Though not stated in any of his formal objections filed below, in a brief filed with the district court Maldonado contended, and he claims on appeal, that defendants "are now attempting to cause the dismissal of the action

by 'buying off' the plaintiffs and their counsel" and that the Maher plaintiffs and their counsel breached "their fiduciary duty owed to Zapata and its shareholders to prosecute the actions selflessly and with due diligence" by reason of the settlement's provision for attorneys' fees and dismissal of Zapata's suit against Maher.

The district court rejected these contentions (*see* its finding No. (2) quoted in the text), and its action in doing so is supported by the record and its long familiarity with the case; it is plainly not clearly erroneous or an abuse of discretion.

There is nothing to indicate that, with the settlement of this suit, Zapata's injunction suit against Maher (*see* note 29, *supra*) was of any potential practical benefit to Zapata or detriment to Maher, et al., and Maldonado has not argued, or pointed to anything indicating, the contrary.

As to attorneys' fees, Zapata agreed not to oppose fees not exceeding $250,000, while Maher, et al. agreed not to request fees in excess of $400,000. This (like the dismissal of the Zapata suit) was, of course, fully disclosed to the district court (as well as being plainly stated in the notice to stockholders). The set-

Maldonado's concern is, as it has consistently been, that the settlement might possibly bar those portions of his own derivative actions which are based on the circumstances surrounding the 1974 modifications to the stock option plan. As above-noted, plaintiffs' second amended complaint plainly charges in its "Background Facts" section that the July 1974 changes in the stock option plan and the interest-free loans then extended, as well as the additional amounts loaned without interest in 1975 to cover the optionees' tax liability from exercise of the options, were detrimental to Zapata and a wasting of its assets, and that the 1977 and 1978 proxy statements failed to disclose the illegal loans and the reasons for the July 1974 stock option amendments. The "Background Facts" allegations were all incorporated by reference in each of the specific causes of action asserted, including the first, regarding section 14(a) violations in the 1977 and 1978 proxy statements, the second, regarding loans in violation of article 2.02 A(6), Tex.Bus.Corp. Act, and the fifth, regarding failure to superintend, exercise independent judgment, and employ adequate controls. However, before the initiation of settlement negotiations, plaintiffs, in a brief filed in August 1979 in opposition to a motion to dismiss, took the position that the Texas four year statute of limitations applied to the loan transactions, and inferentially admitted that it barred their suit as to the 1974 loans and option amendments.[39] We believe that those matters were indeed barred by limitations, a conclusion which Maldonado does not dispute. Moreover, as we have indicated, recovery on the stock option acceleration (and the loans, apart from article 2.02 A(6)), was problematical, even apart from limitations considerations, in light of the determination by Judge Weinfeld and the Second Circuit that this was accomplished by the valid action of fully informed, disinterested directors. And, as noted hereafter, the probabilities additionally strongly favored the 1975 loans also being barred by limitations and the inapplicability of article 2.02 A(6). Further, the Investigation Committee had recommended dismissal of the action as in

tlement was *not* contingent on the award of *any* fees, and the only fees which could be awarded were those found proper by the district court considering, *inter alia,* the benefits to Zapata from Maher's action. That matter was fully briefed below (with Zapata strongly contesting fees over $250,000) and thoroughly and carefully considered by the district court. As more fully set out in the district court's finding No. (5) quoted in the text, it determined that "[t]his lawsuit was at least a contributing factor in several major beneficial changes in Zapata Corporation." This finding is not clearly erroneous or an abuse of discretion. Because of these benefits, plaintiffs were *entitled* to reimbursement for attorneys' fees and costs. The fact that Zapata did not receive a specific monetary recovery does not prevent an award of attorneys' fees. *Mills v. Electric Auto Lite Co.,* 396 U.S. 375, 395–96, 90 S.Ct. 616, 627–28, 24 L.Ed.2d 593 (1970); *Shlensky v. Dorsey,* 574 F.2d at 149; *Ramey v. Cincinnati Enquirer, Inc.,* 508 F.2d 1188 (6th Cir.1974), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Lewis v. Anderson,* 692 F.2d 1267, 1270–71 (9th Cir.1982).

The provisions of the settlement agreement respecting attorneys' fees and dismissal of the Zapata injunction suit against Maher (and the Maher individual suit against Zapata) do not establish collusion or bad faith, or furnish a basis to overturn the district court's findings that the settlement was at arm's length, in good faith, and without collusion.

Maldonado makes no contention that the settlement agreement initiates or continues any illegal or wrongful conduct. *See Robertson v. National Basketball Ass'n,* 556 F.2d 682 (2d Cir.1977).

**39.** The brief included the following: "Insofar as the officers and directors of Zapata have breached their fiduciary duties to the stockholders by permitting the loan transactions, the applicability of the [Texas] four-year limitation statute is warranted.... Contrary to Defendants' assertion, the loans in question were made on or about March 17, 1975. Plaintiffs' action was filed on February 5, 1979, less than four years thereafter. It is not barred by limitations.... Claims comprising Plaintiffs' Fifth Cause of Action are governed by the [Texas] four-year limitation statute .... The particular matters referred to by Defendants as being barred by limitation are merely background facts .... The causes of action pleaded by Plaintiffs are based upon events occurring within the applicable limitations period."

Plaintiffs, however, never amended (or sought to amend) their second amended complaint. *Cf. Meek v. Pittinger,* 374 F.Supp. 639, 646 (E.D.Penn.1974) (three-judge court), *aff'd in part, rev'd in part, on other grounds,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

the best interest of Zapata, a recommendation determined in the New York action to have been made independently, in good faith, and upon proper investigation. Under these circumstances, plaintiffs and Zapata were not obliged to further litigate these claims when, had they done so, it was virtually inevitable that no recovery would have been obtained.

Further, what we are dealing with here is not a release but rather a *judgment* rendered pursuant to a settlement agreement. The settlement agreement calls for a dismissal with prejudice of all claims on behalf of Zapata against the individual defendants "asserted or which could have been asserted in this lawsuit." This language calls for a court judgment, and uses language typically employed to describe the *res judicata* effects of a judgment. *See Restatement (Second) of Judgments* § 24(1) (1982)[40]; *Nilsen v. City of Moss Point,* 701 F.2d 556, 560 (5th Cir.1983); *Aerojet-General Corporation v. Askew,* 511 F.2d 710, 715 (5th Cir.), *appeal dismissed and cert. denied sub nom. Metropolitan Dade County v. Aerojet-General Corp.,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975) (". . . all claims and defenses that were actually raised or could have been raised"). *See also Maldonado v. Flynn, supra,* 417 A.2d 378. The judgment called for by the settlement agreement—and it would appear that any preclusion must rest on the judgment, not the agreement *per se*—decrees that "[t]his action is dismissed with prejudice as to all defendants." This, again, is the customary formulation. Even if a judgment of dismissal is expressly based on limitations, this does not necessarily mean it is not on the merits or that it lacks the normal full preclusive effect. *Nilsen,* 701 F.2d at 562–63. We do not find any improper "broadening" of the settlement or judgment.[41]

Moreover, even broad *releases,* though not to be encouraged, do not necessarily render settlements of derivative actions improper. "It is not uncommon for general releases to be granted in settlements of derivative suits." *Ruskay v. Waddell,* 552 F.2d 392, 394–95 n. 4 (2d Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). *See also In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 221 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 2308, 73 L.Ed.2d 1294 (1982) ("a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint").

We therefore hold that the asserted breadth of the settlement agreement and judgment thereon does not, of itself, establish that the settlement was collusive or fraudulent.

## C. FAIRNESS.

### 1. *Res Judicata.*

Nor do we think that the possible *res judicata* effects of the settlement rendered it so unfair as to prevent approval by Judge Black. In the circumstances of this case, including the above-referenced prior determinations of Judge Weinfeld and the Second Circuit and the recommendation of the Investigation Committee that all three derivative actions be terminated, we agree with Judge Black that, upon his finding that the settlement *as a whole* was reasonable, adequate, and fair to all parties, and in the best interest of Zapata, its possible *res judicata* effects need not be "a determining factor" in, or preclude, the court's decision to approve the settlement.

Judge Black had before him adequate information as to the matters complained of

---

**40.** ". . . the claim extinguished [by judgment] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.*

**41.** We note that Zapata has formally represented in this Court that the settlement and judgment have no "greater effect than would a dismissal of the complaint on the merits after trial." And, those portions of Zapata's submissions to the Second Circuit which Maldonado has furnished us are not to the contrary.

in the New York and Delaware actions, including all that which Maldonado saw fit to present in support of his position that it would not be in Zapata's best interest to prejudice those actions, and the report of the Investigation Committee recommending their dismissal. *See* note 37, *supra.* The allegations of the second amended complaint embraced the matters complained of in the New York and Delaware actions, and we reject Maldonado's assertion that Judge Black did not take those matters into account merely because he refused to make his decision wholly dependent on how the settlement might affect those lawsuits. *See Shlensky v. Dorsey,* 574 F.2d at 144 col. 1.

Under these circumstances, we agree with *Shlensky* that

"... the district court was not precluded from approving the settlement of this shareholders' derivative action because it included an agreement by the parties to release claims other than those pleaded in the complaint where it found, as it did here, that the settlement as a whole was fair and reasonable. *See* 3B *Moore's Federal Practice* p. 23.1–141. *See also Winkelman v. General Motors Corp.,* 48 F.Supp. 490, 495–496 (S.D.N.Y.1942). We think that the question of the actual effect of the general releases on the District of Columbia suit is one to be resolved in that proceeding. *See Delahanty v. Newark Morning Ledger Co.,* 26 F.Supp. 327, 328–329 (D.N.J.1939). We are not persuaded to the contrary by the opinion of the district court in *Herbst v. International Tel. & Tel. Corp.,* 72 F.R.D. 85, 91–92 (D.Conn.1976), cited by the [party appealing approval of the settlement]." *Id.* at 144 col. 2.[42]

We also observe that with respect to the Delaware action, preclusion is a distinct

possibility wholly apart from settlement in the Texas action. *See Maldonado v. Flynn, supra,* 417 A.2d 378.

2. The Range of Possible Recovery.

In *In re Corrugated Container Antitrust Litigation, supra,* a class action antitrust damage suit, this Court held that, before exercising its discretion in passing on the fairness, reasonableness, and adequacy of a settlement agreement, the district court must first "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." 643 F.2d at 213. *See also In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1327 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). Relying on the *Corrugated Container* cases, Maldonado argues that the district court erred in failing to conduct an analysis of the claims asserted in the Texas action so as to arrive at estimates of the range of possible recovery that plaintiffs would realize if they prevailed at trial on each claim.

The proponents of the settlement agreement herein provided the district court with their arguments and positions respecting the merits of the claims being asserted and compromised, the risks of litigation, and the benefits of the compromise. They did not, however, provide the court with an express estimate of the range of possible monetary recovery should plaintiffs prevail at trial. Nor did the court insist on being provided with such an estimate or expressly make such an estimate itself. Yet, it is apparent from the court's Memorandum and Order approving the settlement agreement, that it *accepted* the proponents' contentions that

---

**42.** In regard to the preclusive effects of a settlement, derivative suits are different from many class action suits, especially those class suits having greater potential variance among class members in respect to the benefits from one or more different kinds of relief to be achieved. *See National Super Spuds, Inc. v. New York Mercantile Exch.,* 660 F.2d 9, 18–19 (2d Cir.

1981) ("[t]he fundamental difference between derivative suits and class actions. The plaintiff in a derivative suit is suing on behalf of the corporation. In a derivative suit settlement ... the legal entity whose unpleaded claims are being released—the corporation—is a party to the settlement").

there were serious legal and factual obstacles to recovery on each cause of action, and that this being the case, the probable recovery did not outweigh the costs, both legal and otherwise, that would be incurred by Zapata, should the action be prosecuted to a successful conclusion.

■ Although our *Corrugated Container* decisions plainly establish that a proper evaluation of a proposed settlement agreement should include an estimate of the range of possible monetary recovery on the claims being compromised, we hold that the district court's failure to expressly make such an estimate here, though perhaps erroneous, under the circumstances does not require reversal, especially in view of the relevant factors favoring approval of the settlement and since the analysis actually conducted by the court was sufficient, in the context of this case, to allow it to discharge its function of passing on the fairness of the settlement. *See Desimone v. Industrial Bio-Test Laboratories, Inc.,* 83 F.R.D. 615, 619, 620 (S.D.N.Y.1979); *Weiss v. Drew National Corp.,* 465 F.Supp. 548, 551 (S.D.N.Y.1979). Moreover, in his challenges to the settlement below, Maldonado did not assert that it was inconsistent with some likely range of recovery espoused by him.

We also observe in respect to this matter that a derivative suit of the type before us presents certain considerations not involved as significantly in a class action suit for money damages such as *Corrugated Container.* We have previously adverted to one such differentiating factor (*see* note 42, *supra* ). Further, and perhaps of more significance, where, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action. While this is certainly not invariably the case, we believe Judge Black concluded that it was in this instance (as in substance did the Investigation Committee and the plaintiffs), and that such a conclusion was not an abuse of his discretion under these circumstances. The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification.[43]

(a) Section 14(a).

Respecting plaintiffs' cause of action under section 14(a) of the Exchange Act, relating to misleading omissions in the 1977 and 1978 proxies for election of directors, their complaint sought injunctive relief only,[44] thus, no estimate of the range of possible recovery in regard thereto was even required since no damages for its violation were sought. The district court noted that Zapata had disclosed the substance of the allegations pertaining to the alleged section 14(a) violation, namely, the complaints respecting the conduct of Flynn, in its February 1981 proxy statement. More-

**43.** As indicated earlier in the text, we do not suggest that this obviates the desirability of an express range of recovery analysis, only that it diminishes its relative significance so that in some circumstances, such as those here presented, though not in all, the absence of such an analysis will not require reversal.

Nor do we suggest that the effect of a derivative suit on corporate functioning is necessarily or entirely adverse. To the contrary, here there likely was some initial beneficial effect, as the suit apparently played a part in the improvement of management. But by the time of settlement the beneficial effect had been achieved, and it could reasonably be concluded that further continuation of the suit posed the likelihood of materially adverse effect on corporate functioning, in addition to the current out-of-pocket expenses directly associated therewith.

**44.** The relief sought was removal of directors elected pursuant to the 1977 and 1978 proxy statements, and new proxy solicitation and elections. Moreover, even if damages had been sought, any such recovery would have been quite limited. *See* note 16, *supra.*

over, by the time of the settlement, Flynn had long been removed from the management of Zapata. According to the plaintiffs, the problem that this cause of action sought to correct therefore no longer existed.[45]

### (b) Sections 13(a) and 13(b).

As to the causes of action asserted under sections 13(a) and 13(b) of the Exchange Act, plaintiffs' complaint again sought only to enjoin defendants from violating their provisions. No damages were sought, and an analysis of the range of possible recovery therefore was not required. The district court stated that it was unknown whether private litigants had standing to seek injunctive relief under either section. *See Abbey v. Control Data Corp.,* 603 F.2d 724, 730–31 (8th Cir.1979) *cert. denied,* 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980) (section 13(a)). *See also Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (no implied cause of action for violations of reporting requirements of section 17(a)). With regard to

section 13(b), in Hall's affidavit, and at the settlement hearing, plaintiffs conceded that they had found no evidence that Zapata had made any illegal foreign payments, and that given the substantive corrective accounting and control procedures and practices that had been instituted after the commencement of their lawsuit, further violations were unlikely, thus rendering moot their request for injunctive relief. Respecting section 13(a), which concerned a failure to make a disclosure on Zapata's 1978 form 10–k, filed with the SEC, in connection with Zapata's impending purchase of a substantial block of its own stock from the Crane Company, plaintiffs conceded that this had also been subsequently disclosed.[46]

### (c) Article 2.02 A(6).

Concerning the alleged violation of article 2.02 A(6) of the Texas Business Corporation Act, which concerns the interest-free loans made to Zapata senior officers in connection with their 1974 exercise of the options and resultant taxes,[47] the district court stated

---

**45.** As stated earlier, Judge Black was of the opinion after hearing evidence and argument in connection with Maher's request for a preliminary injunction that Maher had "failed to convince the Magistrate that the [December 21, 1980] Proxy Statement contains erroneous information which would violate the rules applicable to information which must be included therein." *See* note 18, *supra.*

When Judge Black approved the settlement, none of Zapata's seven directors were serving pursuant to elections under the 1978 or earlier proxies. Only one, Mackin (chairman of the board and chief executive officer of Zapata, a nonoptionee director who did not become part of management until Flynn's ouster), was serving pursuant to election under the 1979 proxy. Five of the directors were outsiders who had never been Zapata officers or employees. Three of these outside directors (Daum, Lorenz, and Murdock) first came on the board in 1979, and when the settlement was approved were serving pursuant to elections under the 1980 proxy. The other two outside directors, neither of whom was an optionee, had been on the board during the events at issue, and when the settlement was approved were serving pursuant to elections under the 1980 (Israel) and 1981 (Gueymard) proxies. The remaining director, Lassiter (Zapata's president and chief operating officer, an optionee and a director since October 1974), was serving pursuant to

election under the 1981 proxy when the settlement was approved.

**46.** According to the report of the Investigation Committee, this was a reasonable, proper, and as later events proved, a wise purchase. The report states "the purchase of 599,627 shares on January 22, 1979 at a price of $15.00 when the market price was $13.25 ... was a reasonable investment indeed, given the stock's price of $23.50 at the close of the market on September 17, 1979." According to the district court's opinion, Zapata stock was trading at $55 per share in August 1980, and after a stock split in early 1981, was selling for about $23 per share in June 1981.

**47.** Article 2.02 provides in part:
"A. Subject to the provisions of Sections B and C of this Article, each corporation shall have power:
" . . . .
"(6) To lend money to, and otherwise assist, its employees, but not to its officers and directors."
Article 2.41 A(4) provides:
"The directors of a corporation who vote for or assent to the making of a loan to an officer or director of the corporation, or the making of any loan secured by shares of the corporation, shall be jointly and severally liable to the corporation for the amount of such loan until the repayment thereof."

that it was unclear whether Texas law, which did not authorize such loans to a domestic corporation's officers and directors, or Delaware law, section 143 of the Delaware Corporation Law,[48] which permitted such loans, applied to a Delaware corporation with its headquarters in Texas. Although neither the parties nor the district court made an express estimate of the range of possible recovery in connection with this cause of action, we feel that the court's failure to do so was harmless, in view of the strength of defendants' arguments that no recovery was available respecting the loans. *See Corrugated Container,* 659 F.2d at 1325.

As previously mentioned, the July 1974 loans were all repaid in March 1975, and in any event it is clear that recovery in respect to them was barred by limitations. Of the sums loaned in 1975, about seventy percent had been repaid prior to the settlement.[49] We believe the probabilities likewise most strongly favored any recovery in respect to these transactions also being barred by limitations.[50]

---

Article 8.02, which plaintiffs contended made article 2.02 A(6) applicable to Zapata, provides as follows:

"A. A foreign corporation which shall have received a certificate of authority under this Act shall ... enjoy the same, but no greater, rights and privileges as a domestic corporation organized for the purposes set forth in the application pursuant to which such certificate of authority is issued; and, as to all matters affecting the transaction of intrastate business in this State, it and its officers and directors shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a domestic corporation of like character and its officers and directors."

**48.** Section 143 of the Delaware Corporation Law states:

"Any corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation. The loan, guaranty or other assistance may be *with or without interest,* and may be *unsecured, or secured* in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation...." (Emphasis added.)

**49.** 1975 loans were still outstanding to Lassiter ($140,000), Shiels ($140,000), and Wall ($120,-000). Flynn's loan was repaid by July 1979. Naess's loan was repaid sometime between December 1978 and February 1980. Harrison's loan was repaid sometime between March 1975 and January 1976.

**50.** The applicable limitations period would appear to be two years, as provided by Tex.Rev. Civ.Stat. art. 5526, clause (4) ("Actions for debt where the indebtedness is not evidenced by a contract in writing"). Actions to enforce a statutory liability, such as that provided by articles 2.02 A(6) and 2.41 A(4), Tex.Bus.Corp. Act, (*see* note 47, *supra*), are governed by this statute, *Rose v. First State Bank of Paris, Tex.,* 122 Tex. 298, 59 S.W.2d 810 (1933); *Shaw v. Bush,* 61 S.W.2d 526 (Tex.Civ.App.—Waco 1933, writ ref'd), as are actions to enforce the rights of a corporation against its directors or officers for breach of their common law (or by-law) fiduciary duty to it, *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 579 (Tex.1963); *Refugio Lumber Co. v. Bailey,* 172 S.W.2d 133 (Tex.Civ.App.—San Antonio 1943, writ ref'd), and not the four year residual statute, article 5529. *See also Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438 (1940); *Glenn v. Steele,* 141 Tex. 565, 61 S.W.2d 810 (1933); *Hemphill County v. Rathjen,* 389 S.W.2d 365 (Tex.Civ.App.—Eastland 1965, no writ); *Las Mendozas, Inc. v. Powell,* 368 F.2d 445, 449–50 (5th Cir.1966). Suits by individual stockholders of a dissolved corporation to recover their share of its undistributed assets and for related accounting, *Yeaman v. Galveston Co.,* 106 Tex. 389, 167 S.W. 710, 723 (1914); *Greenspun v. Greenspun,* 145 Tex. 374, 198 S.W.2d 82, 83–84 (1946), appear to represent a distinct and relatively narrow variety of action whose limitations principles have not been applied to claims such as those here considered. It also appears that Tex.Rev.Civ.Stat. art. 5527, clause (1), providing a four year limitations period for actions on written contracts, is inapplicable because the claim here is "not ... by the terms of the contract, but in contradiction thereof." *Schmid v. City Nat. Bank of Wichita Falls,* 132 Tex. 115, 114 S.W.2d 854, 857 (1938). *See also Las Mendozas, Inc. v. Powell, supra; Wm. A. Smith Contr. Co. v. West Cent. Texas Mun. Water Dist.,* 344 F.2d 470, 471–72 (5th Cir. 1965); *Jenkins v. Kimbro,* 380 S.W.2d 189 (Tex.Civ.App.—Austin 1964, writ dism'd); *Howell v. National Bank of Commerce,* 181 S.W.2d 837, 838 (Tex.Civ.App.—San Antonio 1944, writ ref'd). It is not disputed that the Texas statutes of limitations are applicable to this action.

Additionally, it would seem highly likely that in this action, which concerns the strictly internal affairs of a Delaware corporation, section 143 of the Delaware Corporation Law which authorizes such loans (*see* note 48, *supra*), rather than article 2.02 A(6) of the Texas Business Corporation Act (*see* note 47, *supra*) which is a limitation on powers granted Texas corporations, would be applicable. In this connection, it is important to note that article 2.02 A(6) has been authoritatively construed not to render loans by a Texas corporation to its officers or directors either "illegal" or "against public policy," and not to constitute "a positive prohibition" of such loans but, rather, merely "a limitation on a specific power granted." *Whitten v. Republic National Bank of Dallas,* 397 S.W.2d 415, 418 (Tex.1966). While Zapata was headquartered in Houston, Texas, it was certainly not a "*de facto*" or local Texas corporation; it was a sprawling giant with extensive operations, facilities, and properties in numerous states as well as diverse overseas locations, whose stock was traded on the New York stock exchange. *De facto* it was plainly a national, or international, not simply a Texas, entity. Under these circumstances we believe it most unlikely that Zapata's loans to its directors and officers, despite having been made in Texas, would be held to be "intrastate" in Texas under articles 8.01 or 8.02(A), Tex.Bus.Corp. Act,[51] so as to be governed by article 2.02 A(6), rather than Delaware law, at least for purposes other than defining the rights of third parties. While there seem to be no Texas decisions directly in point, general expressions in Texas opinions have long given recognition to the primacy of the state of incorporation respecting internal corporate affairs.[52] Under these circumstances, a federal court in Texas would assume that Texas courts would follow the general rule. *Glazer v. Glazer,* 374 F.2d 390, 407 (5th Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967). As reflected in *Restatement (Second) of Conflict of Laws* § 302, this recognizes the undesirable lack of uniformity, frustration of expectations, and impracticality in having matters "which involve a corporation's organic structure or internal administration, governed by different laws," *id.* comment *e,* and that as to such matters "the local law of the state of incorporation should be applied except in the extremely rare situation where a contrary result is required by the overriding interest of another state in having its rule applied." *Id.* comment *g.* See *Glazer v. Glazer, supra; National Lock Co. v. Hogland,* 101 F.2d 576, 587 (7th Cir. 1938).[53]

---

**51.** Article 8.02(A) is set out in note 47, *supra.* Article 8.01 provides in part:

"A. ... No foreign corporation shall be entitled to procure a certificate of authority under this Act to transact in this State any business which a corporation organized under this Act is not permitted to transact. A foreign corporation shall not be denied a certificate of authority by reason of the fact that the laws of the State or country under which such corporation is organized governing its organization and internal affairs differ from the laws of this State, and nothing in this Act contained shall be construed to authorize this State to regulate the organization of such corporation, or its internal affairs not intrastate in Texas.

"B. Without excluding other activities which may not constitute transacting business in this state, a foreign corporation shall not be considered to be transacting business in this state, for the purposes of this Act, by reason of carrying on in this state any one (1) or more of the following activities:

" . . . .

"(2) Holding meetings of its directors or shareholders or carrying on other activities concerning its internal affairs; ... "

**52.** *See, e.g., Graham v. New Mexico Eastern Gas Co.,* 141 S.W.2d 389, 391 (Tex.Civ.App.—Dallas 1940, no writ) (citing cases). *See also Garrett v. Phillips Pet. Co.,* 218 S.W.2d 238, 240 (Tex.Civ.App.—Amarillo 1949, writ dism'd); *Southwestern Portland Cement Co. v. Latta & Happer,* 193 S.W. 1115, 1125 (Tex.Civ.App.—El Paso 1917, writ ref'd). We do not regard *Fowler v. Bell,* 90 Tex. 150, 37 S.W. 1058 (1896), as being to the contrary, since it involved relations of the corporation with third parties in a manner contrary to the "policy of this state." *Id.* 37 S.W. at 1061.

**53.** *See also Rogers v. Guaranty Trust Co.,* 288 U.S. 123, 130, 53 S.Ct. 295, 297, 77 L.Ed. 652 (1933) ("... in respect of its internal affairs the company was to be governed by the laws of the State in which it was organized.... [W]hatever the tribunal chosen ..."); *Broderick v.*

## (d) Fiduciary Duties.

Finally, with regard to plaintiffs' cause of action based on the defendants' alleged breach of fiduciary duties to Zapata, the district court noted plaintiffs' contentions that after a lengthy and thorough investigation, there was no concrete evidence that any of the directors were aware of Flynn's alleged wrongful and improper actions,[54] and that, in view of the strength of the

Delaware "business judgment rule," recovery from them in connection with their decisions respecting Flynn's compensation ·and the 1974 amendments to the stock option plan was highly questionable.[55] As to Flynn, the settlement between him and Zapata respecting his employment contract took into consideration many of the questionable items on past expense accounts and use of the Corporation's assets.[56]

*Rosner,* 294 U.S. 629, 643–44, 55 S.Ct. 589, 592–93, 79 L.Ed. 1100 (1935) (law of state of incorporation looked to "as marriage looks to domicile"). We do not regard *Mansfield Hardwood Lumber Co. v. Johnson,* 268 F.2d 317, 321 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), as being to the contrary. There, we observed that no "statutory laws of the incorporating state are applicable and *all* contact points are in the forum." *Id.* at 321. Here, the statutes of the incorporating state expressly authorize interest-free, unsecured loans by corporations organized under its laws to their officers and directors; and, by no means are all of Zapata's contact points in Texas. Moreover, in *Johnson* the suit did not involve the organic structure or internal administration of the corporation (as does this action) but, rather, the individual rights of a stockholder were defrauded in a negotiated sale of his shares back to the corporation. *Cf. Restatement (Second) of Conflict of Laws* § 302, comments *e* (as to some matters which though "peculiar to corporations" nevertheless "do not affect matters of organic structure or internal administration," such as "transfer of individual shares," there is less need to have only law of state of incorporation apply) and *f* (reference to "the typical blue sky law").

**54.** The record strongly supports defendants' position that Flynn was removed almost immediately when it became evident that his drinking problem was interfering with the discharge of his corporate duties.

**55.** *See* text, section III.A., above.

The Investigation Committee report reflects that it retained an outside compensation consulting firm to review past executive compensation levels at Zapata. This study indicated that Zapata's compensation levels were materially below those of comparable companies for comparable positions. The Committee concluded that the stock option loans and matters in connection therewith were legitimate executive compensation, even if the cost to Zapata included giving up all the asserted potential income tax deductions (though the Committee concluded that Zapata, due to its peculiar tax situation, actually could have had only a minimum benefit from such a deduction, *see* note 10, *supra*), and that as to the loans, whose

terms and interest-free provisions were related to continued employment, the "net cost of interest foregone . . . is actually less than the net cost of direct salary increases which would otherwise have been required" for "the desired and desirable goal of executive stability and continuity for the Company at the lowest cost."

Moreover, as previously noted, claims concerning the stock option acceleration and loans appear to have been barred by limitations.

**56.** The record shows that Zapata, in negotiating its settlement with Flynn, took into account his potential travel account abuses, which were in the area of $25,000 to $50,000, and his failure to pay a profit estimated at $25,000 to a Zapata subsidiary, Zapata Warrior, which constructed certain improvements to his home. The record also shows that an audit of the top officers' expense accounts over a three-year period, conducted at a cost of about $50,000, revealed that, apart from the matters mentioned in the previous sentence, only about $3,000 in business expenses of Flynn could not be properly accounted for. Moreover, the record contains statements indicating that Flynn's overall compensation package was at or below that of executives of similar stature in businesses of comparable size.

As to alleged corporate opportunities that were lost because of Flynn's drinking problem, the record shows that the only possible one concerned a transaction with a foreign company in 1977, with which, at the time of the investigation of the independent Investigation Committee, Zapata was doing business. Because it was felt that an investigation of this past transaction, involving as it would the interviewing of the principals of the foreign concern, would be detrimental to Zapata's ongoing relationship with it, the Investigation Committee did not pursue it. However, the record contains a statement by a Zapata official that had the transaction with the foreign company been consummated, Zapata would have earned an estimated $2,000,000 to $2,500,000 during 1977 and 1978. On the other hand, part of the deal had the possibility of causing Zapata to lose approximately $1,000,000 to $1,500,000 for those two years. The record also contains a statement by Lassiter that Flynn's drinking had

Given the clear, acknowledged weaknesses, and in some respects, lack of evidentiary and legal support, on which to base a recovery by the Corporation on this cause of action,[57] the failure of the district court to arrive at an estimate of the range of possible recovery was harmless, especially in light of the difficulty in relating Flynn's misconduct to any injury suffered by Zapata, and in placing a damage figure on any such injury. *See Weiss,* 465 F.Supp. at 551; *Desimone,* 83 F.R.D. at 620.

(e) The Benefits of Compromise.

As to the benefits of the settlement, the district court noted that continuation of the action would result in additional fees and costs to Zapata, and that the benefits facilitated by its commencement and maintenance would not be further enhanced by its continued prosecution. The court noted that "the parties' conclusion that any possible benefit to Zapata from pursuing the causes of action would be more than offset by the additional cost of litigation was based on an intelligent and prudent evaluation of their case."

(f) Conclusion.

In view of the above, we feel that the analysis conducted by the district court was sufficient under all the circumstances, especially in view of the fact that the assertions made regarding the difficulties as to maintenance of the plaintiffs' lawsuit were largely uncontradicted, and in the absence of any evidence or argument offered by Maldonado on which a more detailed analysis or estimate of the range of possible recovery could be made.[58]

3. Lack of Monetary Consideration.

Maldonado's next argument is that the settlement is unfair because its terms do not provide for any direct monetary consideration to be paid Zapata in exchange for the relinquishment of its claims against the defendants. Parties to the settlement of a shareholders' derivative action are, however, permitted great freedom in shaping the form of the settlement consideration. *Levin v. Mississippi River Corporation,* 59 F.R.D. 353, 367 n. 38 (S.D.N.Y.), *aff'd sub nom., Wesson v. Mississippi River Corporation,* 486 F.2d 1398 (2d Cir.), *cert. denied,* 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973). "The fact that the form of the settlement decided upon is somewhat unusual in that it includes some benefits which cannot be evaluated in financial terms does not militate against its acceptance . . . ." *Levin,* 59 F.R.D. at 367 n. 38. Thus, a settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the derivative action is brought, even though no direct monetary benefits are paid by the defendants to the corporation. *See Goldman v. Northrop Corporation,* 603 F.2d at 108–09; *Lewis v. Anderson,* 81 F.R.D. 436, 438–39 (S.D.N.Y.1978); *Milstein v. Werner,* 57 F.R.D. at 521–23. *See also Hill v. Art Rice Realty Co.,* 66 F.R.D. 449, 453 (N.D. Ala.1974), *aff'd,* 511 F.2d 1400 (5th Cir.1975) ("[i]t does not follow as a matter of course, that money must be paid to make every settlement a reasonable one"). Moreover, as noted, much of the relief sought was nonmonetary in nature.

Here, before the settlement hearing was held, a stipulation of benefits signed by Zapata, the independent Investigation Committee, and the plaintiffs was submitted to the district court. This stipulation, which listed numerous benefits that the institution and maintenance of plaintiffs' action had facilitated, was relied upon

nothing to do with Zapata's failure to consummate this deal and that it was "all a matter of profit margins." The Investigation Committee was unable to identify any damage done to the Corporation by Flynn's conduct.

**57.** This is particularly shown in the materials and interviews conducted by the Investigation Committee.

**58.** Maldonado made no request for additional time in order to conduct his own discovery into the fairness of the settlement agreement. *See Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975).

by the district court in approving the settlement. (*See* district court's finding No. (5), *supra*). Moreover, it is plain that one of the principal purposes of the settlement was to terminate the litigation to avoid any further legal expense to Zapata, and, of at least as great importance, to take its management "out of the courtroom and restore them fulltime to the corporate board room and business." *Milstein,* 57 F.R.D. at 521. The avoidance of this expense, both monetarily in the form of litigation fees and expenses, and nonmonetarily in the form of disruption and distraction of management, and threatened impairment of the Corporation's credit and goodwill, are important and valid reasons for seeking a settlement, *Lewis,* 81 F.R.D. at 439, and may warrant its approval. As the court stated in *Goldman:*

> "Instead of choosing the course of securing the greatest possible money judgment from the [individual defendants], the parties and the court chose the course of terminating litigation and taking steps to assure that such conduct as had been disclosed could not occur in the future." 603 F.2d at 109.

We hold that, under the circumstances here, the district court did not abuse its discretion in approving the settlement agreement, even though it provided for no monetary consideration to be paid Zapata.

## IV.

### CONCLUSION

Under the circumstances of this case, it has not been demonstrated that Judge Black's approval of the settlement constituted an abuse of his discretion, or that there were deficiencies in the notice requiring reversal. Accordingly, the judgment below is affirmed.

AFFIRMED.